UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
Case No. 3:19-cv-00522

| | |
|---|---|
| SERIES 1 OF OXFORD ) <br> INSURANCE COMPANY ) <br> NC, LLC, ) <br>         Plaintiff, ) <br> v. ) <br> ) <br> BUCKLEY, LLP, ) <br> ) <br>         Defendant. ) | **COMPLAINT** |

1. This is an action for declaratory relief pursuant 28 U.S.C. § 2201. Plaintiff Series 1 of Oxford Insurance Company NC, LLC ("Oxford") is seeking to have this Court declare what obligation, if any, Oxford has to indemnify Buckley, LLP ("Buckley") under an insurance policy issued to Buckley on a key individual at its law firm.

**PARTIES**

2. Plaintiff Series 1 of Oxford Insurance Company NC LLC is a series of a limited liability company, organized under the laws of the State of Delaware, and licensed as a special purpose captive insurance company by the North Carolina Commissioner of Insurance.

3. Defendant Buckley, LLP is an international law firm, formerly known as Buckley Sandler, LLP, and organized as a limited liability partnership. Upon information and belief, Buckley and its predecessors have always been organized under the partnership law of the District of Columbia.

4. The residence of the members of the Oxford limited liability company are diverse from the residence of the partners of Buckley, and thus there is complete diversity of this action.

## JURISDICTION AND VENUE

5. Oxford issued policy No. BSL-17-NC, effective December 30, 2017 to December 30, 2018 ("the Policy") to Buckley. The Policy provided various coverages to Buckley, including coverage for loss of key employees. The Policy has a per claim limit of $6 million and an aggregate limit of $12 million.

6. Buckley has made demand against Oxford for the full single claim limit of $6,000,000.00.

7. Under the Policy, both parties agreed that North Carolina was the exclusive jurisdiction for the resolution of any disputes arising under the Policy, and both agreed to submit to the jurisdiction of courts in North Carolina.

8. All Parties have an interest in the obligations, if any, of Oxford with respect to indemnifying Buckley for the claim it has tendered and for which it has demanded indemnification.

9. Venue is proper in that the Parties agreed in the Policy that all questions regarding their rights and obligations under the Policy are governed by North Carolina law.

## BACKGROUND FACTS

### The Policy and Buckley's Claim for Loss of Key Employee

10. Buckley is an international law firm with offices in Washington D.C., Los Angeles, New York, San Francisco, Chicago, and London.

11. In 2017, Buckley sought to form a captive insurance company and obtain a package of coverages, including Loss of Key Employee coverage on certain partners of the firm.

12. In 2017, while seeking to form a captive insurance company, Buckley formed a business relationship with Oxford and certain affiliates of Oxford.

13. Oxford Risk Management Group LLC, ("ORMG"), an affiliate of Oxford, is the sponsor of a captive insurance program (the "Captive Program"), which provides opportunities for privately held businesses to enhance their risk management program by supplementing their existing commercial insurance.

14. Under ORMG's Captive Program, privately held businesses, primarily in the middle market, establish captive insurance companies for the purpose of insuring risks acceptable to the owners of the captives and to the regulators in the captive's domicile. ORMG administers various North Carolina captive insurance companies that participate in the Captive Program (the "NC Captives").

15. ORMG established Oxford to serve as a fronting carrier to issue insurance policies to the various insured operating companies that are related to the NC Captives. Under the terms of the various reinsurance contracts to which Oxford is a party, 20% of the amount of each claim made under a policy issued by Oxford is paid by the captive(s) that are related to the insured claimant, and the other 80% is paid by the other, unrelated, captive insurance companies participating in the Captive Program. These captive insurance companies include the NC Captives, as well as other captive insurance companies administered by ORMG and domiciled in other jurisdictions (collectively, the captives participating in the reinsurance contracts are the "Reinsurance Pool").

16. Oxford does not retain any risk or liability for claims under any of its policies. Under the terms of its various reinsurance agreements, 100% of the risks and premiums written by Oxford is ceded to the Reinsurance Pool. Oxford is responsible for administering claims made under its policies and collecting the amount of approved claims, including settlement amounts and loss adjustment expenses, from the Reinsurance Pool.

17. Ultimately, Buckley sought to form six NC Captives in 2017, each to be owned by a partner of Buckley (the "Buckley Captives"). ORMG assisted with the formation and licensing of the Buckley Captives as North Carolina pure captive insurance companies. One of the Buckley Captives, called Nola Risk Management LLC, was formed by Andrew L. Sandler.

18. Prior to the implementation of the Buckley Captives, ORMG's affiliate, Oxford Research Group, LLC conducted underwriting due diligence with Buckley to identify current uninsured exposures, document any economic loss history for requested coverage, obtain data needed for third party actuarial firms to underwrite the coverage, and discuss policy limits.

19. During the underwriting process, Buckley described several risks that were not adequately, if at all, covered by its existing commercial insurance policies. An independent actuary rated and priced the coverages, and among those selected for inclusion by the Buckley Captives were Employment Practices Liability Insurance, Reputational Risk, and Loss of Key Employee coverages.

20. On or about December 29, 2017, Buckley paid to Oxford $6,010,200 in premium based on the selected coverages.

21. On or about December 30, 2017, ORMG submitted captive insurance license applications for the Buckley Captives to the North Carolina Department of Insurance. The respective business plans accompanying the license applications requested authorization (1) for Oxford to issue the Policy to Buckley with a December 30, 2017 effective date, and (2) for Oxford and the Buckley Captives to enter into reinsurance agreements, pursuant to which 20% of the amount of any claim made under the Policy is borne collectively by the Buckley Captives, with the remaining 80% of the amount of such a claim to be borne by the unrelated participants in the Reinsurance Pool.

22. Because the Captive Program contemplates Oxford's reinsuring 100% of the premium and risk received under the Policy to the Reinsurance Pool, including the Buckley Captives, and because without a certificate of authority from the North Carolina Department of Insurance, the Buckley Captives could not transact insurance business and reinsure Oxford, the Policy was not issued until after the Buckley Captives were duly formed, organized, and licensed.

23. Because of extended negotiations between Buckley and ORMG regarding the terms of the service agreements between the Buckley Captives and ORMG, the Buckley Captives were not fully formed, organized, and licensed until May 2018. On or about May 11, 2018, Oxford issued the Policy and the reinsurance contracts between Oxford and the Buckley Captives were executed, all with a December 30, 2017 effective date. A copy of the Policy is attached as **Exhibit A.**

24. Among the coverages in the Policy is coverage for "Loss of Key Employee." As defined under the Policy, a key employee included certain officers or leadership members of the firm, and scheduled individuals.

25. The Policy also contained a "Period of Restoration," which was the twelve months following the date of a Scheduled Event, such as the departure of a Key Employee.

26. The Policy provided coverage for actual net loss and required the Insured to mitigate its losses. The mitigation requirement, taken together with the Period of Restoration, meant that a policyholder's claim for Loss of a Key Employee would not be ripe for a claims determination until twelve months after that Key Employee could no longer perform work, whether caused by bodily injury, illness, death, or by voluntary termination of the employment

5

relationship by the Key Employee, and after taking into account the Insured's efforts to mitigate its damages during the Period of Restoration.

### Allegations of Misconduct Against Andrew Sandler Were Never Disclosed to Oxford Before the Policy Was Issued

27. According to information provided by Buckley to Oxford, in mid-December of 2017, members of Buckley's Executive Committee began to investigate certain allegations against Mr. Sandler from years earlier.

28. Buckley's Executive Committee then consulted with the firm's general counsel, and subsequently had a meeting with Kathryn Ruemmler, Global Co-Chair of White Collar and Investigations at the law firm of Latham & Watkins' Washington D.C. office to advise on the matter.

29. This initial meeting with Ms. Ruemmler was on December 21, 2017.

### Buckley Was Applying For Insurance from Oxford While its Executive Committee Knew of the Allegations Against Mr. Sandler

30. Buckley started its underwriting process with Oxford in October 2017, had its underwriting interview in November 2017, and completed its applications, selected coverages, and paid its premium in late December 2017.

31. On or about December 30, 2017, ORMG submitted captive insurance license applications for the Buckley Captives to the North Carolina Department of Insurance.

32. The allegations against Mr. Sandler were significant enough to the Executive Committee that it hired Ms. Ruemmler on December 21, 2017, before the inception of the Policy.

33. No one from Buckley, including neither its Chairman and Executive Partner nor its Executive Committee, informed Oxford of the allegations against Mr. Sandler before the captive insurance applications were submitted.

34. Mr. Sandler, a partner in the firm, did not disclose knowledge of any allegations against himself, even though the alleged misconduct occurred years prior to the insurance application.

**The Departure of Mr. Sandler**

35. Mr. Sandler was a founding member of the law firm and, pursuant to the firm's partnership agreement, was eligible for retirement benefits upon reaching various age milestones.

36. At the time the coverages were bound, and as recently as February 2018, Andrew Sandler was the Chairman, Executive Partner, and co-founder and named partner in the Defendant (then-named Buckley Sandler, LLP).

37. On or about February 5, 2018, Mr. Sandler and Buckley entered into negotiations regarding his departure from the firm, subject to a document that was ultimately titled a "retirement agreement."

38. According to information provided by Buckley, partners, Executive Committee members, and Buckley Captives owners Ben Klubes, Chris Witeck, and John Kromer negotiated with Mr. Sandler about his departure from Buckley for approximately three weeks in February 2018. Only at the conclusion of those negotiations did Buckley give notice to Oxford of Mr. Sandler's departure, despite being in regular contact with Oxford during that same month regarding the management of the Buckley Captives.

39. The negotiations between Buckley and Mr. Sandler regarding his departure included that Buckley and Mr. Sandler agreed on the wording of his communication to clients

7

and staff. By email dated February 7, 2018, in wording that was approved by the law firm, Mr. Sandler announced to the Firm and its clients that "In recent months, I have been transitioning my client relationships to others at the Firm . . ." which indicated that his withdrawal from the law firm necessarily began prior to December 30, 2017.

40. Initial drafts circulated between Buckley and Mr. Sandler referred to their agreement as a "Separation Agreement," which was later changed to refer to a "Retirement Agreement." According to Buckley's records, when Buckley and Mr. Sandler reached an impasse about some of the terms of that agreement, they decided to hire an arbitrator and were on the eve of arbitration when they finally reached a settlement and signed the "Retirement Agreement" dated February 26, 2018. Neither the fact that the Retirement Agreement was negotiated in this fashion, nor that Mr. Sandler and Buckley settled on terms for it on the eve of arbitration, were not disclosed to Oxford until June 2019.

41. On March 7, 2018, Mr. Witeck sent written notice of the claim for loss of a key employee to Oxford.

42. On or about October 1, 2018, Mr. Sandler informed Oxford that his departure from the firm was involuntary.

43. Mr. Sandler also stated that his departure from the firm was involuntary in a letter from his lawyer on October 22, 2018, in a phone conversation with Mr. Witeck on February 3, 2019, in an email to Mr. Witeck on February 11, 2019, and in an interview conducted on June 19, 2019.

44. Due in part to the conflicting information that Oxford was receiving from Mr. Sandler and Buckley, Oxford retained an independent adjuster to assist on the investigation of this claim.

45. During the investigation by the independent adjuster, on September 13, 2019, three partners of Buckley (Mr. Klubes, Mr. Witeck, and Mr. Kromer) all confirmed that in December 2017, they knew there were allegations against Mr. Sandler which could lead to Mr. Sandler being terminated by Buckley.

46. This knowledge was prior to the inception of the Oxford Policy.

### Oxford's Searching and Thorough Claims Investigation

47. Oxford does not retain any risk or premium, does not earn any underwriting profits, and does not suffer financial loss when a claim is approved. From a financial perspective, Oxford is wholly indifferent to the disposition of any particular claim. Oxford's sole interest is in protecting the integrity of the Reinsurance Pool and the Captive Program. Every participant in the Captive Program benefits from the due diligence conducted by Oxford. These participants include the Buckley Captives, and by virtue of its ownership. Oxford takes the task of evaluating every single claim in an evenhanded manner very seriously, and its process in evaluating the claim has been no different.

48. After receiving the claim, Oxford began a searching and thorough claims investigation.

49. Among other things, Oxford or its investigators or adjusters sought:

   a. To interview Mr. Sandler, certain current partners of the firm, and certain former associates of the firm,

   b. To obtain and review updated financial data from Buckley through March 20, 2019 and audited financials for Buckley for 2017 and 2018 and associated documents,

   c. To obtain and review records related to Sandler's billable time and originations,

   d. To obtain and review all correspondence with Sandler regarding his departure from Buckley,

9

e. To obtain and review other relevant documents.

50. Oxford's claims investigation commenced immediately after receiving notice of the claim, notwithstanding that calculation of Actual Net Loss could not be completed until the expiration of the Period of Restoration in March 2019.

51. In January 2019, Oxford also hired an independent, third-party claims adjuster; Curley Adjustment Bureau, Inc. ("CAB") to assist with the claim determination.

52. In March 2019, Buckley Sandler made demand on Oxford to pay the full per claim limit of $6,000,000 and threatened litigation, enclosing a draft complaint, notwithstanding that the inconsistencies regarding the nature of Mr. Sandler's departure had not been resolved, and that CAB had not completed its analysis.

53. If a payment were approved in the amount of $6,000,000.00, Mr. Sandler's own captive insurance company would pay $400,000 of the claim to the Firm. Mr. Sandler has stated that he would require a court's adjudication of the claim to permit the payment.

54. At the conclusion of CAB's investigation, CAB recommended at least two valid bases in the Policy upon which Oxford could legitimately deny Buckley's claim.

## THE INSURANCE POLICY

55. Oxford issued policy No. BSL-17-NC to Buckley, effective December 30, 2017 to December 30, 2018.

56. The Policy contains coverage for Loss of Key Employee.

57. The Policy provides for an Initial Effective Date of December 30, 2017 and covers Scheduled Events that occur after that date, pursuant to the Insuring Agreement of the Policy, which states:

> A. Subject to the limits, conditions and exclusions contained in this **Policy**, and to any applicable **Deductible**, Company will pay **Insured**

10

the amount of **Actual Net Loss** arising from any **Scheduled Event** that first occurs during the **Policy Period** and is reported during the **Policy Period** or the **Grace Period**…

58. The Policy has a per claim limit of $6,000,000.

59. The Policy defines, in pertinent part, that a Key Employee is:

    A person:

    1. holding any of the officer positions created by the charter, constitution, by-laws or any other similar governing document of an **Insured**; or

    2. who is a Chief Executive Officer, Chief Financial Officer; Chief Administrative Officer; Executive Vice President or equivalent leadership position with an **Insured**; or

    3. with specialized skills and efforts that are directly responsible for 10% or more of the **Insured's** annual gross revenue and is reported to **Company** during the underwriting of this **Policy**; or

    4. who is specified on a schedule to this **Policy**.

During the underwriting before the Policy was issued, the Firm identified Andrew L. Sandler as an officer of the Firm and as originating more than 10% of the gross revenue of the Firm.

60. The Policy provides, in pertinent part:

    BB. Period of Restoration: The period of time beginning at the time of the **Scheduled Event** and ending on the earlier of:

    1. the date that **Insured is** able to produce goods and provide services at the same level, efficiency and speed as before the **Scheduled Event**; and

    2. twelve months from the date that the **Scheduled Event** first occurs.

61. The Policy further defines a "Loss of Key Employee" Scheduled Event, in pertinent part, as:

    38. "Loss of Key Employee" event, which means the loss of a **Key Employee** attributable to (a) bodily injury to such **Key Employee** resulting in such **Key Employee's** inability to perform the same type of work that such **Key Employee** performed prior to the bodily injury; (b) the illness of

11

such **Key Employee** resulting in the loss of the services of the **Key Employee** for a period no less than 60 days; (c) the voluntary termination by such **Key Employee** of his or her employment with **Insured**; or (d) the death of such **Key Employee**. **Actual Net Loss** in connection with a Loss of Key Employee event shall include **Income Loss** and **Extra Expenses**, such as costs of advertising for new job applicants to replace the **Key Employee**, travel, lodging, meal and entertainment expenses incurred in selection of a new **Key Employee**; and miscellaneous extra costs incurred in finding, meeting and negotiating with a new **Key Employee** including, but not limited to, costs to verify the background and references of applicants, and overtime pay and legal expenses incurred to draw up employment contracts.

62. Another coverage selected by the Firm was Employment Practices Liability coverage, which states, in pertinent part:

> "Employment Practices Liability" event, which means the initiation of a **Claim** alleging one or more of the following offenses; provided, however, that such offense must be employment-related:
>
> * * *
>
> g. harassment;
>
> * * *
>
> **Actual Net Loss** in connection with an Employment Practices Liability event shall include **Claims Expenses** and **Claims Losses** arising from such **Claim**.

63. "Claims Expenses" include attorney's fees.

64. The Policy also contains certain exclusions.

65. The Policy contains an exclusion for prior knowledge, which excludes coverage for:

> A. any fact, circumstances, situation, transaction, threatened **Claim** or **Administrative Action** or event which, as of the **Initial Effective Date**, **Insured** knew or reasonably should have known would be likely to result in the occurrence of a **Scheduled Event**;

66. The Policy contains an "expected or intended" exclusion which excludes coverage for:

12

> D. any action taken by **Insured**, individually or in concert with others, that is intended by **Insured**, or that can be expected from the standpoint of a reasonable person, to cause an **Actual Net Loss** to **Insured**;

67. The Policy contains a cancellation of contracts exclusion which excludes coverage for:

> M. with respect to **Scheduled Events** 36, 37, 38, 39 and 44, the cancellation, termination or nonrenewal of any contract or business relationship by an **Insured**;

68. The Policy further excludes:

> DD. any liability arising out of an action taken by an **Insured** that is intended by **Insured**, or can be expected from the standpoint of a reasonable person, to cause injury, even if the injury is of a different degree or type than intended or expected.

69. The Policy also requires Buckley to take all reasonable steps to mitigate its damages and contains the following provision:

> H. <u>Concealment, Misrepresentation and Fraud</u>.
> 1. Any fraud, misrepresentation, concealment or nondisclosure with respect to (a) information provided to **Company** or its affiliates in connection with the acceptance of risk under this **Policy**; or (b) information provided with respect to the reporting of a **Scheduled Event** or **Actual Net Loss** pursuant to Section V of this **Policy** shall render this **Policy** void.
> 2. If this **Policy** is voided pursuant to Section IX.H.1, **Insured** will be liable to refund to **Company** any payments **Company** may have made to **Insured** under this **Policy**.

70. After learning of Mr. Sandler's departure, and before the captive closed and the Policy was issued, Oxford provided Buckley's counsel with an updated draft policy with two draft endorsements, one of which clarified the other exclusions of the Policy in that a voluntary retirement of any of the six owners of the Buckley Captives, which included Mr. Sandler, would not constitute a covered claim.

# **FIRST CLAIM FOR RELIEF**

## *Declaratory Judgment as to the Insurance Policy*

71. Oxford realleges and incorporates herein by reference the preceding paragraphs as if fully set forth.

72. An actual and justiciable controversy exists between the parties as to Oxford's obligation to provide indemnity to Buckley for the claims asserted in the Claim Filing Form and Claim Submission pursuant to the Policy.

73. Oxford contends that it has no obligation to provide $6,000,000.00 in indemnity to Buckley for the claim under the terms, limitations, conditions and provisions of the Policy for several reasons, including, but not limited to:

   a. Buckley does not seek to recover damages for the voluntary departure of a Key Employee;

   b. Buckley does not seek to recover damages, in whole or in part, for Loss of a Key Employee caused by an "occurrence";

   c. Buckley seeks to recover damages which are excluded in whole or in part by the "prior knowledge" exclusion;

   d. Buckley seeks to recover damages which are excluded in whole or in part by the "expected or intended" exclusion;

   e. Buckley seeks to recover damages which are excluded in whole or in part by the "cancellation of contracts" exclusion.

   f. Buckley seeks to recover damages which are excluded in whole or in part by the Subsection DD. exclusion for intentional action which results in unintended harm.

   g. Buckley seeks to recover damages for which it has not provided evidence or proof of an actual net loss, for which reimbursement coverage under the Policy would be triggered.

   h. Buckley failed to mitigate its damages.

74. Oxford is informed and believes that Defendant disputes Oxford's position and contends that (1) Oxford has an obligation to provide indemnity to Buckley and (2) Buckley has suffered actual net losses in excess of $6,000,000.00.

75. A judicial declaration is required of the rights and obligations of Oxford under the Policy as to any obligation to provide indemnity to Buckley for losses, if any, which may be due under the Policy.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Oxford prays for relief as follows:

1. That this Court enter judgment that Oxford has no obligation to provide indemnity under the Policy to Buckley for losses, if any, which may arise from the departure of Andrew Sandler, pursuant to the Policy's terms.

2. For a declaration of the rights and obligations of Oxford under the Policy to Buckley for its claim for Loss of Key Employee.

3. For costs of suit.

4. For attorney fees.

5. For such other and further relief as this Court deems just and proper.

This the 9th day of October, 2019.

Respectfully submitted,

*/s/ James P. Cooney III*
NC Bar No. 12140
Womble Bond Dickinson (US) LLP
One Wells Fargo Center, Suite 3500
301 South College Street
Charlotte, NC 28202-6037
Telephone: (704) 331-4980
Fax: (704) 338-7838
E-Mail: Jim.Cooney@wbd-us.com

Elizabeth J. Bondurant
Womble Bond Dickinson (US) LLP
271 17th Street, N.W., Suite 2400
Atlanta, Georgia 30363-1017
Telephone: (404) 872-7000
Fax: (404) 888-7490
Email: Lisa.Bondurant@wbd-us.com

Jonathan R. Reich (NC Bar No. 41546)
Womble Bond Dickinson (US) LLP
One West Fourth Street
Winston-Salem, NC 27101
Telephone: (336) 721-3623
Fax: (336) 726-9020
Email: Jonathan.Reich@ wbd-us.com

*Counsel for Plaintiff*