# EXHIBIT A

# SERIES 1 OF OXFORD INSURANCE COMPANY NC LLC
## Actual Net Loss Insurance Policy

## DECLARATIONS

**Named Insured:**
Buckley Sandler, LLP

**Policy Number:  BSL-17-NC**

**Effective Date:**  12/30/2017 (12:01 a.m.)
**Expiration Date:**  12/30/2018 (12:01 a.m.)
**Retroactive Date:**  12/30/2014 (12:01 a.m.)

IN RETURN FOR THE PAYMENT OF THE PREMIUM SHOWN BELOW, AND SUBJECT TO ALL THE TERMS OF THIS POLICY, WE AGREE WITH YOU TO PROVIDE THE INSURANCE STATED IN THIS POLICY.  THIS IS A CLAIMS MADE POLICY.

| Schedule of Events: | Initial Effective Date: | Limit of Liability Per Occurrence: | Deductible |
|---|---|---|---|
| Breach/Release of Data | 12/30/2017 | $6,000,000 | $0 |
| Breach/Release of Data related to Hacking and/or Virus Exposure | 12/30/2017 | $6,000,000 | $0 |
| Contingent Business Interruption | 12/30/2017 | $6,000,000 | $0 |
| Deductible Reimbursement (All Other) | 12/30/2017 | $6,000,000 | $0 |
| Employee Benefits Plan Administration Error | 12/30/2017 | $6,000,000 | $0 |
| Employment Practices Liability | 12/30/2017 | $6,000,000 | $0 |
| Legislative and Regulatory Changes | 12/30/2017 | $6,000,000 | $0 |
| Loss of Key Employee | 12/30/2017 | $6,000,000 | $0 |
| Political Risk | 12/30/2017 | $6,000,000 | $0 |
| Reputational Risk | 12/30/2017 | $6,000,000 | $0 |
| Trade Credit | 12/30/2017 | $6,000,000 | $1,600,000 |

**Aggregate Limit of Liability:**          $12,000,000

**Premium:**          $6,010,200

Issue Date:  May 11, 2018

*Mary Claire Goff*

Mary Claire Goff
Authorized Person

# Series 1 of Oxford Insurance Company NC LLC

## Actual Net Loss Insurance Policy

This insurance policy is issued by **Company** to the **Insured**. This is a claims-made policy. The occurrence of any **Scheduled Event** must be reported by **Insured** during the **Policy Period** or the **Grace Period** under the terms of Section V of the **Policy**.

**THIS POLICY IS A REIMBURSEMENT POLICY. COMPANY HAS NO OBLIGATION TO INVESTIGATE OR DEFEND ANY CLAIMS AGAINST INSURED. COMPANY HAS NO DUTY TO DEFEND INSURED. ONLY INSURED IS ENTITLED TO PAYMENT BY COMPANY.**

**VARIOUS PROVISIONS RESTRICT COVERAGE. READ THE ENTIRE POLICY CAREFULLY TO DETERMINE RIGHTS, DUTIES AND WHAT IS AND IS NOT COVERED.**

Words and phrases that appear in **bold** have special meaning. Please refer to the Definitions (Section I).

In consideration of the payment of the premium, in reliance on the representations made by **Insured** to **Company**, and subject to the terms of this **Policy**, **Company** agrees with **Insured** as follows:

I. DEFINITIONS

    A. Actual Net Loss: Losses incurred by **Insured** as a result of a **Scheduled Event**. Actual Net Loss for which **Company** provides coverage in connection with each **Scheduled Event** is identified in the definition for such **Scheduled Event** and may include **Claims Expenses**, **Covered Expenses**, **Claims Losses**, **Extra Expenses**, and/or **Income Loss**, or such other measure of loss as is specified in the definition for such **Scheduled Event**.

    B. Administrative Action: Any lawsuit, hearing, audit, investigation, proceeding, review board, or similar activity or appeal held or initiated against **Insured** or against any director, officer or employee of **Insured** in his or her capacity as a director, officer or employee of such Insured, or claims against such director, officer or employee solely by reason of his or her acting in such capacity, by any local, county, state or federal government or agency or delegate thereof. A **Scheduled Event** caused by the initiation of an **Administrative Action** shall be deemed to first occur at the time that **Insured** has actual notice of the **Administrative Action**.

    C. Aggregate Limit of Liability: The most that **Company** will pay under this **Policy**, regardless of the number of occurrences of Scheduled Events or total amount of

**Actual Net Loss**. The Aggregate Limit of Liability is specified in the Declarations.

D. Cancellation Date: The date that any cancellation of this **Policy** pursuant to Section VIII shall be effective. The Cancellation Date shall be specified by the party cancelling the **Policy**.

E. Claim:

    1.   A written demand or written threatened action made against **Insured**, or a director, officer or employee of an **Insured** in his or her position or capacity as a director, officer or employee of such **Insured**, or claimed against such director, officer or employee solely by reason of his or her serving in such capacity, for monetary damages or to cease and desist activities allegedly conducted by **Insured** or such director, officer or employee; or

    2.   a complaint filed with any state or federal court demanding damages or injunctive relief against **Insured**, or a director, officer or employee of an **Insured** in his or her position or capacity as a director, officer or employee of such **Insured**, or claimed against such director, officer or employee solely by reason of his or her serving in such capacity; or

    3.   any arbitration proceeding initiated against **Insured**, or a director, officer or employee of an **Insured** in his or her position or capacity as a director, officer or employee of such **Insured**, or claimed against such director, officer or employee solely by reason of his or her serving in such capacity, demanding damages or injunctive relief against **Insured** or such director, officer or employee; or

    4.   the service of a subpoena on **Insured** pursuant to a civil or administrative proceeding, whether or not **Insured** is a named party to such proceedings.

A **Scheduled Event** caused by the initiation of a **Claim** shall be deemed to first occur at the time that **Insured** receives written notice of the **Claim**.

F. Claims Expenses: Reasonable and necessary costs, fees (including audit costs, attorney fees and expert fees) and expenses (other than expenses arising out of or that are related to any type of wages, salaries or fees of the employees, officers and/or directors of any **Insured**) incurred by an **Insured** as a result of a **Claim** or **Administrative Action** or in the investigation, defense or appeal of a **Claim** or an **Administrative Action** and actually paid by such **Insured**.

G. Claims Losses: Amounts arising out of a **Claim** or **Administrative Action** that such **Insured** is legally obligated to pay, including damages, settlement amounts, legal fees and costs awarded pursuant to judgments, and payments made pursuant to **Insured's** obligation to defend or indemnify its officers, directors, employees or independent contractors, and that are actually paid by such **Insured**.

H. Company: Series 1 of Oxford Insurance Company NC LLC, a special purpose captive insurance company licensed by the State of North Carolina.

I. Covered Expenses: Costs, fees and expenses, other than **Claims Losses**, incurred by **Insured** as a result of a **Scheduled Event** during the twelve-month period starting with the date that the **Scheduled Event** first occurred and actually paid by such **Insured**.

J. Covered Policy: Any commercial insurance policy issued to an **Insured** that is in force as of the **Effective Date** of the **Policy** or that is first issued to **Insured** during the **Policy Period**; provided that such policy is disclosed to **Company** prior to the **Effective Date** or, if issued during the **Policy Period**, within ten days of issuance. Covered Policy does not include any other insurance policy issued by **Company** or any employee health care insurance policy.

K. Deductible: With respect to a **Scheduled Event**, the amount of the Deductible specified in the Declarations of this **Policy**.

L. Effective Date: The Effective Date specified in the Declarations of this **Policy**.

M. Expiration Date: The Expiration Date specified in the Declarations of this **Policy**.

N. Extra Expenses: Reasonable costs, fees and expenses incurred during the **Period of Restoration** to avoid or minimize **Income Loss** and actually paid by **Insured**.

O. Grace Period: A period starting on the earlier of the **Cancellation Date** or the **Expiration Date** and ending thirty (30) days after the **Cancellation Date** or **Expiration Date**, as applicable. The Grace Period does not extend the **Policy Period**. In the event that this **Policy** is voided pursuant to Section IX.H of this **Policy** or cancelled due to non-payment of premiums, no Grace Period shall apply.

P. Impaired Property: Tangible property, other than an **Insured's Product** or **Insured's Work**, that cannot be used or is less useful because:

   1. it incorporates an **Insured's Product** or **Insured's Work** that is known or thought to be defective, deficient, inadequate or dangerous; or

   2. an **Insured** has failed to fulfill the terms of a contract or agreement; if such property can be restored to use by:

      a. the repair, replacement, adjustment or removal of the **Insured's Product** or **Insured's Work**; or

      b. an **Insured** fulfilling the terms of the contract or agreement.

Q. Income Loss: Loss of net profit (before taxes) that would have been earned by the **Insured** during the **Period of Restoration** in the absence of the **Scheduled**

Case 3:19-cv-00522-FDW-DSC   Document 1-1   Filed 10/09/19   Page 5 of 38

**Event**, taking into account the actual experience of the **Insured's** business before the **Scheduled Event** and the probable experience the **Insured** would have had without the **Scheduled Event**.

R. Initial Effective Date: With respect to a **Scheduled Event**, the date specified as the Initial Effective Date in the Declarations of this **Policy**.

S. Insured: Any person, partnership or organization named as an **Insured** in the Declarations or by an endorsement to this **Policy**.

T. Insured's Product:

    1. any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by:

        a. an **Insured**;

        b. others trading under **Insured's** name; or

        c. a person or organization whose business or assets an **Insured** has acquired;

    2. containers (other than vehicles), materials, parts or equipment furnished in connection with such goods or products.

U. Insured's Work: Work or operations performed by an **Insured** or on an **Insured's** behalf and materials, parts or equipment furnished in connection with such work or operations.

V. Key Customer: A third party to whom **Insured** provides goods or services, which third party:

    1. represents 10% or more of the **Insured's** annual gross revenue and is reported to **Company** during the underwriting of this **Policy**; or

    2. is specified on a schedule to this **Policy**.

W. Key Employee: A person:

    1. holding any of the officer positions created by the charter, constitution, by-laws or any other similar governing document of an **Insured**; or

    2. who is a Chief Executive Officer, Chief Financial Officer; Chief Administrative Officer; Executive Vice President or equivalent leadership position with an **Insured**; or

    3. with specialized skills and efforts that are directly responsible for 10% or more of the **Insured's** annual gross revenue and is reported to **Company** during the underwriting of this **Policy**; or

    4. who is specified on a schedule to this **Policy**.

X. Key Referral Source: A third party that regularly refers business to **Insured** that:

  1. represents 10% or more of **Insured's** annual gross revenue and is reported to **Company** during the underwriting of this **Policy**; or

  2. is specified on a schedule to this **Policy**.

Y. Key Supplier: A third party who provides services or delivers goods to **Insured**, or who provides goods or services brokered by **Insured** which third party:

  1. represents 10% or more of the annual value of merchandise, supplies, parts, materials and services purchased or brokered by **Insured** and is reported to **Company** during the underwriting of this **Policy**; or

  2. is specified on a schedule to this **Policy**.

Z. Limit of Liability Per Occurrence: The maximum amount that the **Company** will pay with respect to any occurrence of a **Scheduled Event**, as specified in the Declarations of this **Policy**.

AA. Named Insured: The **Insured** specified as the Named Insured in the Declarations or by an endorsement to this **Policy**.

BB. Period of Restoration: The period of time beginning at the time of the **Scheduled Event** and ending on the earlier of:

  1. the date that **Insured is** able to produce goods and provide services at the same level, efficiency and speed as before the **Scheduled Event**; and

  2. twelve months from the date that the **Scheduled Event** first occurs.

CC. Policy: This Actual Net Loss Insurance Policy, issued to the **Insured**, together with all endorsements and schedules hereto.

DD. Policy Period: The period beginning with the **Effective Date** and ending on the earlier of the **Cancellation Date**, if any, or the **Expiration Date**.

EE. Pollutant: Any form of energy or substance, natural or man-made, which has the ability to contaminate the environment, causing harmful effects and damaging nature in general.

FF. Retroactive Date: The Retroactive Date specified in the Declarations of this **Policy**.

GG. Scheduled Event: An event specified in the Declarations of this **Policy**, the occurrence of which causes a loss to an **Insured**. The Scheduled Events are defined as follows:

  1. "Administrative Actions" event, which means the initiation of an **Administrative Action**, other than an **Administrative Action** related to any duty imposed by rules or regulations promulgated by or statutes administered by the Federal Aviation Administration, or imposed by the Health Insurance Portability and Accountability Act, or

Case 3:19-cv-00522-FDW-DSC  Document 1-1  Filed 10/09/19  Page 7 of 38

related to **Insured's** Medicare or Medicaid billing practices, related to the **Insured's** provision of medical services, related to the Employee Retirement Income Security Act of 1974, as amended (ERISA), or related to regulation of transportation or shipping. In connection with an Administrative Actions event, **Actual Net Loss** shall include **Income Loss**, **Extra Expenses**, **Claims Expenses** and **Claims Losses** associated with the **Administrative Action**; however, **Actual Net Loss** shall not include:

a. taxes found to be due as a result of any **Administrative Action**; or

b. benefits or wages found to be due or any funding shortfall under any employee benefit plan found to be owing as a result of any **Administrative Action**.

2. "Aircraft Mechanical Breakdown" event, which means one of the following events causing direct physical damage to aircraft owned or leased by **Insured** and used in **Insured's** business, necessitating the repair or replacement of such aircraft:

a. Mechanical breakdown, including rupture or bursting caused by centrifugal force;

b. Artificially generated electrical current, including electrical arcing that damages electrical devices, appliances and/or wires;

c. Bursting, cracking or splitting.

Ordinary wear and tear, depletion, deterioration, rust, corrosion, erosion or settling of aircraft or the parts or instruments of such aircraft do not qualify as an Aircraft Mechanical Breakdown event. Loss or damage arising from misalignment, mis-calibration, tripping off-line, or any condition which can be corrected by resettling, tightening, adjusting or cleaning, or by the performance of maintenance does not qualify as an Aircraft Mechanical Breakdown event. **Actual Net Loss** in connection with an Aircraft Mechanical Breakdown event shall include **Income Loss** and **Extra Expenses**, including reasonable expenses incurred in repairing such aircraft including parts and labor, and costs of renting temporary substitute aircraft. **Actual Net Loss** shall not include costs incurred with respect to the performance of maintenance.

3. "Billing Errors & Omissions" event, which means the initiation of a **Claim** based on an alleged wrongful act with respect to billing for services rendered or goods provided, including alleged errors, mistakes and misinterpretations. **Actual Net Loss** in connection with a Billing Errors & Omissions event shall include **Claims Expenses** and **Claims Losses** arising from such **Claim**; however **Actual Net Loss** shall not include amounts that are refunded or returned by

**Insured** or otherwise recovered from **Insured** by any payee as a result of such **Claim**.

4. "Breach/Release of Data" event, which means the unauthorized access to **Insured's** computer system, including **Insured's** operating systems, software, hardware, and all communication and open system networks and cloud networks, wheresoever hosted, arising out of actual or alleged neglect, breach of duty or omissions by **Insured**, which causes:

   a. the unauthorized publication by a non-insured of an **Insured's** client's personal or proprietary information which was held within **Insured's** computer system; or

   b. **Insured's** computer system to transmit, by e-mail or other means, a virus to a third party.

   **Actual Net Loss** associated with a Breach/Release of Data event shall include **Claims Expenses**, **Claims Losses** and any **Covered Expenses** arising from such event, including but not limited to expenses associated with restoring or reconstructing lost electronic data or computer programs or with notifying clients of any unauthorized publication of their personal information.

5. "Breach/Release of Data related to Hacking and/or Virus Exposure" event, which means:

   a. the unauthorized access to **Insured's** computer system, including **Insured's** operating systems, software, hardware, and all communication and open system networks and cloud networks, wheresoever hosted, arising out of a virus, malicious instruction, hacking, malware, phishing, or pretexting, which causes:

      i. the unauthorized publication of an **Insured's** client's personal or proprietary information which was held within **Insured's** computer system; or

      ii. **Insured's** computer system to transmit, by e-mail or other means, a virus to a third party; or

   b. loss to **Insured** of electronic data or computer programs stored within **Insured's** computer system, including **Insured's** operating systems, software, hardware, and all communication and open system networks and cloud networks, wheresoever hosted, resulting directly from a virus, malicious instruction or denial of service attack.

   **Actual Net Loss** associated with a Breach/Release of Data related to Hacking and/or Virus Exposure event shall include **Claims Expenses**, **Claims Losses**, **Income Loss** and **Extra Expenses** associated with such unauthorized access to **Insured's** computer system and

Case 3:19-cv-00522-FDW-DSC   Document 1-1   Filed 10/09/19   Page 9 of 38

**Covered Expenses** arising from such event, including but not limited to expenses associated with restoring or reconstructing lost electronic data or computer programs.

6. "Business Interruption" event, which means the interruption or cessation of business of **Insured** for a period of no less than 24 hours, caused by (a) direct physical loss or damage to property owned by **Insured** or used in **Insured's** business operations, or (b) weather events or other events resulting in the suspension of operations. **Actual Net Loss** in connection with a Business Interruption event shall include **Income Loss** and **Extra Expenses**.

7. "Communicable Disease Liability" event, which means the initiation of a **Claim** based on actual or alleged transmission of any disease that is transmissible by infection or contagion through contact with humans or animals, or through bodily fluids, contaminated objects, airborne inhalation, or a similar agent, occurring on **Insured's** premises or otherwise arising out of or in connection with **Insured's** business operations. **Actual Net Loss** in connection with a Communicable Disease Liability event shall include **Claims Expenses** and **Claims Losses** arising from such **Claim**.

8. "Computer System Failure" event, which means the breakdown of **Insured's** computer system or the failure of software used by **Insured** in its business; however, a breakdown or software failure resulting from a virus, malicious instruction or denial of service attack shall not qualify as a Computer System Failure event. Ordinary wear and tear, depletion, deterioration, or obsolescence do not qualify as a Computer System Failure event. Loss or damage arising from faulty installation or updating of software or hardware, or any condition which can be corrected by performance of maintenance does not qualify as a Computer System Failure event. **Actual Net Loss** in connection with a Computer System Failure event shall include **Covered Expenses** such as rental or replacement equipment expenses, expenses incurred in making systems and records compatible with new equipment, data recovery expenses and consultants' fees related to the foregoing, **Income Loss**, and **Extra Expenses**. **Actual Net Loss** in connection with a Computer System Failure event shall not include costs incurred with respect to the performance of maintenance.

9. "Contingent Business Interruption" event, which means the interruption or cessation of **Insured's** business for a period of no less than 24 hours as a result of the interruptions to the business of any supplier or customer of **Insured**, caused by physical damage or loss to the property or location of such supplier or customer. **Actual Net Loss** in connection with a Contingent Business Interruption event shall include **Income Loss** and **Extra Expenses**, such as costs of cover, costs of advertising and marketing for new suppliers or customers, travel, lodging, meal and entertainment expenses incurred

Case 3:19-cv-00522-FDW-DSC   Document 1-1   Filed 10/09/19   Page 10 of 38

in selection of a new supplier or customer, and miscellaneous extra costs incurred in finding, meeting and negotiating with a new supplier or customer including, but not limited to, costs to verify the background and references of prospective new suppliers or customers, and overtime pay and legal expenses incurred to draw up supplier or customer contracts.

10. "Continuing Resolution" event, which means the defunding of a contract between **Insured** and the federal or any state or local government pursuant to a continuing resolution of the legislative body charged with appropriating funds for such contract. **Actual Net Loss** in connection with a Continuing Resolution event shall include **Income Loss** and **Extra Expenses**.

11. "Contractual Liability" event, which means the initiation of a **Claim** against **Insured** by any party to a written contract with **Insured** to pay or refund money related to that contract, to reduce the amount due to **Insured** under that contract, or to pay costs and/or expenses, if such obligation is in connection with any obligation contained in that contract:

   a. to repair, replace or otherwise make good any defects to any design, engineering, materials and workmanship of any products or equipment supplied by **Insured** under such contract including but not limited to costs of packing, transportation, disconnection, disassembly, disposal, repair, removal, engineering, materials, remanufacture, redesign, modification, adjustment, reinstallation, re-connection to equipment, re-testing, or re-inspection associated with such repair or replacement; or

   b. to reimburse the party for costs incurred by such party to repair, replace or otherwise make good any defects to any design, engineering, materials and workmanship of any products or equipment supplied by **Insured** under such contract, including but not limited to costs of packing, transportation, disconnection, disassembly, disposal, repair, removal, engineering, materials, remanufacture, redesign, modification, adjustment, reinstallation, re-connection to equipment, re-testing, or re-inspection associated with such repair or replacement, whether such reimbursement is in the form of a payment made to such party or a reduction in amount due the **Insured**; or

   c. to re-perform any services deemed to be defective under such contract, including any costs and expenses associated with such re-performance; or

   d. to reimburse the party for costs incurred by such party to re-perform any services deemed to be defective under such contract, including any costs and expenses associated with such re-performance, whether such reimbursement is in the form of a

payment made to such party or a reduction in amount due the **Insured**; or

e. to supply or adjust any item which is required for safe and reliable operation or convenient maintenance or for achieving the performance stipulated in such contract; or

f. to reimburse or refund to the party a portion of sums due **Insured** under such contract as a result of **Insured's** failure to satisfy any warranty or guarantee contained in such contract; or

g. to repair any damage to property owned or leased by the party, or **Insured's Work**, that is caused by **Insured's** failure to satisfy any warranty or guarantee contained in such contract; or

h. to indemnify any party to such contract from any suits, actions, administrative proceedings, claims, demands, losses, damages, costs and expenses as a result of **Insured's** failure to satisfy any warranty or guarantee contained in such contract, including reimbursement of a party to such contract for costs incurred in affording **Insured** assistance in conducting such proceedings or claims; or

i. to pay incidental or consequential damages to a party to such contract resulting from **Insured's** breach of a guarantee or warranty under a contract.

**Actual Net Loss** associated with a Contractual Liability event shall include **Claims Expenses**, **Claims Losses** and **Covered Expenses**, including but not limited to expenses to satisfy any obligation contained in such contract and/or indemnify any party to such contract.

12. "Crime" event, which means the unlawful taking of property to the deprivation of the **Insured** or a third party, whether by an employee or a third party, and whether such property is at the **Insured's** premises or in transit, including takings accomplished by means of forgery, embezzlement, burglary, robbery, fraud (including credit card fraud, computer fraud and electronic funds transfer fraud) and extortion. A Crime event shall be deemed to first occur at the time when **Insured** first becomes aware of facts which would cause a reasonable person to assume that a loss of a type covered by this **Scheduled Event** has been or will be incurred, regardless of when the act or acts causing or contributing to such loss occurred, even though the exact amount or details of the loss may not then be known, or when an **Insured** first receives notice of an actual or potential **Claim** in which it is alleged that such **Insured** is liable to a third party under circumstances which, if true, would constitute a loss under this **Scheduled Event**.

**Actual Net Loss** under a Crime event shall include losses incurred by

Case 3:19-cv-00522-FDW-DSC   Document 1-1   Filed 10/09/19   Page 12 of 38

**Insured** arising out of such event, including loss or damage to money, securities and tangible property of **Insured**, reimbursement to **Insured** of sums paid to third parties arising out of such event and **Claims Expenses** and **Claims Losses** resulting directly from such event. **Actual Net Loss** includes loss resulting directly from forgery or from alteration of checks, drafts, promissory notes or similar written promises, orders or directions to pay a sum certain in money that are made or drawn by or drawn on an **Insured**, or made or drawn by one acting as an agent of an **Insured**. **Actual Net Loss** does not include losses indirectly caused by such event such as an **Insured's** inability to realize income that such **Insured** would have realized had there been no event, or payment of costs, fees or other expenses incurred by **Insured** in establishing either the existence or the amount of a loss under this **Policy**.

13. "Crop Damage, Difference in Conditions" event, which means the loss or damage of crops grown by **Insured** due to natural disasters, such as hail, drought, and floods that would be covered by a **Covered Policy** providing crop insurance but for: (a) the application of an exclusion listed in such **Covered Policy**; or (b) the exhaustion of policy limits in such **Covered Policy**. **Actual Net Loss** in connection with a Crop Damage, Difference in Conditions event shall include amounts unavailable for coverage under the **Covered Policy** due to such exclusion or exhaustion of policy limits. A Crop Damage, Difference in Conditions event shall be deemed to first occur at the time that **Insured** receives a final determination of coverage from the issuer of the **Covered Policy**.

14. "Deductible Reimbursement (All Other)" event, which means any actual loss, damage or expenses covered under a **Covered Policy**, other than a commercial automobile, or workers compensation policy, for which a deductible applies; provided that a Deductible Reimbursement (All Other) event shall not include loss, damage or expenses related to wind and/or hail. **Actual Net Loss** in connection with a Deductible Reimbursement (All Other) event shall consist of amounts paid by **Insured** pursuant to the deductible provision of the applicable **Covered Policy** and shall not exceed the amount of the deductible under the **Covered Policy** that is applied to such loss, damage or expenses. A Deductible Reimbursement (All Other) event shall be deemed to first occur at the time that **Insured** first incurs **Actual Net Loss** related to such event.

15. "Deductible Reimbursement (Commercial Auto)" event, which means any actual loss, damage or expenses covered under a commercial automobile **Covered Policy**, for which a deductible applies. **Actual Net Loss** in connection with a Deductible Reimbursement (Commercial Auto) event shall consist of amounts paid by **Insured** pursuant to the deductible provision of the applicable **Covered Policy** and shall not exceed the amount of the deductible under the Covered

Case 3:19-cv-00522-FDW-DSC   Document 1-1   Filed 10/09/19   Page 13 of 38

Policy that is applied to such loss, damage or expenses. A Deductible Reimbursement (Commercial Auto) event shall be deemed to first occur at the time that **Insured** first incurs **Actual Net Loss** related to such event.

16. "Deductible Reimbursement (Wind and Hail)" event, which means any actual loss, damage or expenses resulting from wind and hail, covered under a **Covered Policy** that insures **Insured's** wind and hail risks, for which a deductible applies. **Actual Net Loss** in connection with a Deductible Reimbursement (Wind and Hail) event shall consist of amounts paid by **Insured** pursuant to the deductible provision of the applicable **Covered Policy** and shall not exceed the amount of the deductible under the **Covered Policy** that is applied to such loss, damage or expenses. A Deductible Reimbursement (Wind and Hail) event shall be deemed to first occur at the time that **Insured** first incurs **Actual Net Loss** related to such event.

17. "Deductible Reimbursement (Workers Compensation)" event, which means any actual loss, damage or expenses covered under a **Covered Policy** insuring **Insured's** workers compensation risks, for which a deductible applies. **Actual Net Loss** in connection with a Deductible Reimbursement (Workers Compensation) event shall consist of amounts paid by **Insured** pursuant to the deductible provision of the applicable **Covered Policy** and shall not exceed the amount of the deductible under the **Covered Policy** that is applied to such loss, damage or expenses. A Deductible Reimbursement (Workers Compensation) event shall be deemed to first occur at the time that **Insured** first incurs **Actual Net Loss** related to such event.

18. "Defense Cost Reimbursement" event, which means the initiation of a **Claim**; provided that such **Claim** would not be covered under any other **Scheduled Event** triggered by the initiation of a **Claim**. **Actual Net Loss** in connection with a Defense Cost Reimbursement event shall include **Claims Expenses** associated with such **Claim** but does not include **Claims Losses**.

19. "Directors and Officers" event, which means the initiation of a **Claim** alleging a violation of a director or officer of **Insured's** fiduciary duties to the **Insured**, or any matter claimed against such director or officer solely by reason of his or her serving in such capacity. **Actual Net Loss** in connection with a Directors and Officers event shall include **Claims Expenses** and **Claims Losses** arising from such **Claim**.

20. "Eminent Domain" event, which means (a) the seizure by the federal government or a state or local government of **Insured's** private property; (b) the expropriation by the federal government or a state or local government of **Insured's** property; or (c) the seizure by the federal government or a state or local government of **Insured's** rights to property, without **Insured's** consent, for either public use or a public

purpose. **Actual Net Loss** in connection with an Eminent Domain event includes **Income Loss** and **Extra Expenses** related to loss of rental or other business income, and **Covered Expenses**, including consequential and incidental expenses related to the seizure or expropriation.

21. "Employee Benefits Plan Administration Error" event, which means the initiation of a **Claim** alleging a violation of **Insured's** or a director or officer of **Insured's** fiduciary duties with respect to administration or management of a an employee benefit plan or alleging a negligent act, error or omission with respect to administration or management of an employee benefit plan. **Actual Net Loss** in connection with an Employee Benefits Plan Administration Error event shall include **Claims Expenses** and **Claims Losses** arising from such **Claim**.

22. "Employment Practices Liability" event, which means the initiation of a **Claim** alleging one or more of the following offenses; provided, however, that such offense must be employment-related:

   a. wrongful demotion or failure to promote, wrongful negative evaluation, reassignment or discipline of a current employee or wrongful refusal to employ;

   b. wrongful termination including actual or constructive termination;

   c. wrongful denial of training, wrongful deprivation of career opportunity or breach of employment contract;

   d. negligent hiring or supervision which results in any of the other offenses listed in this definition;

   e. retaliatory action against an employee because the employee has:

      i. declined to perform an illegal or unethical act;

      ii. filed a complaint with a governmental authority or a lawsuit or other civil action against any **Insured** in which damages are claimed;

      iii. testified against any **Insured** at a legal proceeding; or

      iv. notified a proper authority of any aspect of an **Insured's** business operation which is illegal;

   f. coercing an employee to commit an unlawful act or omission within the scope of that person's employment;

   g. harassment;

   h. libel, slander, invasion of privacy, defamation or humiliation; or

   i. verbal, physical, mental or emotional abuse arising from violation

Case 3:19-cv-00522-FDW-DSC   Document 1-1   Filed 10/09/19   Page 15 of 38

of a person's civil rights with respect to such person's race, color, national origin, religion, gender, marital status, age, sexual orientation or preference, physical or mental condition, or any other protected class or characteristic established by any federal, state or local statutes, rules or regulations.

**Actual Net Loss** in connection with an Employment Practices Liability event shall include **Claims Expenses** and **Claims Losses** arising from such **Claim**.

23. "Environmental Liability" event, which means the initiation of a **Claim** based on the release, discharge, dispersal, seepage, migration, escape or leakage of one or more **Pollutants** at any facility owned or occupied by **Insured**. **Actual Net Loss** in connection with an Environmental Liability event shall include **Claims Expenses** and **Claims Losses** arising from such **Claim**.

24. "Errors & Omissions, Difference in Conditions" event, which means the initiation of a **Claim** based on alleged failure by an **Insured** to perform to contractual specifications, or alleged negligence by an **Insured** with respect to such **Insured's** provision of goods or professional services; provided that such **Claim** would be covered by an errors and omissions or malpractice **Covered Policy** but for: (a) the application of an exclusion listed in such **Covered Policy**; or (b) the exhaustion of policy limits in the **Covered Policy**. **Actual Net Loss** in connection with an Errors & Omissions, Difference in Conditions event shall include **Claims Expenses** and **Claims Losses** arising from such **Claim**.

25. "Excess Medical Malpractice Defense Cost Reimbursement" event, which means the initiation of a **Claim** based on alleged negligence by an **Insured** with respect to such **Insured's** provision of medical services; provided that the subject of such demand is a cause that would be covered under an errors and omissions or malpractice **Covered Policy** but for the exhaustion of policy limits. **Actual Net Loss** in connection with an Excess Medical Malpractice Defense Cost Reimbursement event shall include **Claims Expenses** arising from such **Claim**, subject to the provisions of Section III of this **Policy**. **Actual Net Loss** in connection with an Excess Medical Malpractice Defense Cost Reimbursement event does not include **Claims Losses**.

26. "FAA Action" event, which means the initiation by the Federal Aviation Administration or its delegate of an **Administrative Action** alleging a breach by **Insured** of any duty imposed by rules or regulations promulgated by or statutes administered by the Federal Aviation Administration. **Actual Net Loss** in connection with a FAA Action event shall include **Claims Expenses**, **Claims Losses** and **Covered Expenses**, including assessments, fines, penalties, sanctions, and

other costs to ensure compliance with Federal Aviation Administration rules, regulations, standards or contractual requirements, and consultant expenses.

27. "General Liability Difference in Conditions" event, which means the initiation of any **Claim** alleging bodily injury, property damage or personal and advertising injury that would be covered by a general commercial liability **Covered Policy** but for: (a) the application of an exclusion listed in such **Covered Policy**; or (b) the exhaustion of policy limits in such **Covered Policy**. **Actual Net Loss** in connection with a General Liability Difference in Conditions event shall include **Claims Expenses** and **Claims Losses**.

28. "HIPAA Violations" event, which means the initiation by the United States Department of Health and Human Services or its delegate of a **Claim** or **Administrative Action** alleging a breach by **Insured** of any duty imposed by the Health Insurance Portability and Accountability Act. **Actual Net Loss** in connection with a HIPAA Violations event shall include **Claims Expenses**, **Claims Losses** and **Covered Expenses**, including assessments, fines, penalties, sanctions, and other costs to ensure compliance with the Health Insurance Portability and Accountability Act and any associated rules, regulations and consultant expenses.

29. "Injunction Risk" event, which means the imposition by a court or a federal, state or local agency of a temporary restraining order, preliminary or permanent injunction, or similar injunctive order preventing **Insured** from conducting all or part of its business. **Actual Net Loss** in connection with an Injunction Risk event shall include **Income Loss** and **Extra Expense** arising from the imposition of such temporary restraining order, preliminary or permanent injunction, or similar injunctive order.

30. "Intellectual Property" event, which means:

    a. the initiation of a **Claim** alleging copyright, trademark, trade dress or patent infringement arising out of **Insured's** operations, and from actions filed with the United States Trademark Trial and Appeal Board; or

    b. the discovery by **Insured** of actual or potential infringement of an **Insured's** copyright, trademark, trade dress or patent.

    **Actual Net Loss** in connection with an Intellectual Property event under subsection (a) shall include **Claims Expenses** and **Claims Losses** associated with such **Claim**. **Actual Net Loss** in connection with an Intellectual Property event under subsection (b) shall include legal expenses incurred in respect of legal services actually rendered and expenses actually incurred to prosecute copyright, trademark or patent infringement claims against third parties; provided that

Case 3:19-cv-00522-FDW-DSC   Document 1-1   Filed 10/09/19   Page 17 of 38

**Company's** liability to pay any amounts under subsection (b) shall be conditioned on delivery by **Insured** to **Company** of an opinion of independent counsel that **Insured** is more likely than not to prevail in such prosecution of copyright, trademark or patent infringement claim(s).

31. "Inventory Spoilage" event, which means loss or damage from spoilage to the products sold by **Insured** or used in **Insured's** business caused by failure of freezing, refrigeration or drying machinery or by contamination by refrigerant. **Actual Net Loss** in connection with an Inventory Spoilage event includes **Income Loss**, **Extra Expenses** and **Covered Expenses**, including expenses to clean up and dispose of spoiled property.

32. "Kidnap and Ransom" event, which means the kidnapping, extortion, wrongful detention, or hijacking against any employee or principal of **Insured**. **Actual Net Loss** in connection with a Kidnap and Ransom event shall include **Income Loss**, **Extra Expenses**, **and Covered Expenses** arising from such kidnapping, extortion, wrongful detention or hijacking, including the surrender of property or other considerations by **Insured** that is directly attributable to such kidnapping, extortion, wrongful detention or hijacking.

33. "Legislative and Regulatory Changes" event, which means the adoption or promulgation of federal, state or local laws, regulations or ordinances, other than laws, regulations or ordinances related to the minimum wage of employees or employee benefits, or related to the medical industry, or imposing new taxes or increasing taxes, by any legislative body, executive authority or agency, affecting an **Insured's** business and resulting in increased costs or operating expenses, reduction in the **Insured's** production capacity, or the **Insured's** withdrawal of a product or service from the market. **Actual Net Loss** in connection with a Legislative and Regulatory Changes event shall include **Covered Expenses**, **Income Loss** and **Extra Expenses** associated with such adoption or promulgation of federal, state or local laws, regulations or ordinances. For purposes of providing notice under this **Policy,** a Legislative and Regulatory Changes event shall be deemed to first occur at the time that **Insured** has, or reasonably should have, knowledge that **Actual Net Loss** is expected to arise from such adoption or promulgation. For purposes of calculating the **Period of Restoration** or the period under which **Insured** is permitted to recover **Covered Expenses**, a Legislative and Regulatory Changes event shall be deemed to occur at the time that **Insured** first experiences **Actual Net Loss** as a result of the implementation of the law, regulation or ordinance.

34. "Legislative and Regulatory Changes Related to the Medical Industry" event, which means the adoption or promulgation of federal, state or local laws, regulations or ordinances, by any legislative body,

executive authority or agency, related to the medical industry or medical and health insurance industry, other than laws, regulations or ordinances related to the minimum wage of employees or employee benefits, or imposing new taxes or increasing taxes, affecting an **Insured's** business and resulting in increased costs or operating expenses, reduction in the **Insured's** production capacity, or the **Insured's** withdrawal of a product or service from the market. **Actual Net Loss** in connection with a Legislative and Regulatory Changes event shall include **Covered Expenses**, **Income Loss** and **Extra Expenses** associated with such adoption or promulgation of federal, state or local laws, regulations or ordinances. For purposes of providing notice under this **Policy,** a Legislative and Regulatory Changes Related to the Medical Industry event shall be deemed to first occur at the time that **Insured** has, or reasonably should have, knowledge that **Actual Net Loss** is expected to arise from such adoption or promulgation. For purposes of calculating the **Period of Restoration** or the period under which **Insured** is permitted to recover **Covered Expenses**, a Legislative and Regulatory Changes Related to the Medical Industry event shall be deemed to occur at the time that **Insured** first experiences **Actual Net Loss** as a result of the implementation of the law, regulation or ordinance.

35. "Liquidated Damages" event, which means the attachment of a legal obligation for **Insured** to pay liquidated, ascertained or stipulated damages pursuant to a written contract. **Actual Net Loss** in connection with a Liquidated Damages event shall include the amount of such liquidated, ascertained or stipulated damages.

36. "Loss of Franchise" event, which means the termination or cancellation of **Insured's** license to sell or market goods or to sell or market services pursuant to a franchising contract, agreement or arrangement. **Actual Net Loss** in connection with a Loss of Franchise event shall include **Income Loss** and **Extra Expenses** incurred as a result of such termination or cancellation.

37. "Loss of Key Customer" event, which means:

    a. the wrongful termination or wrongful cancellation by a **Key Customer** of any contract between **Insured** and such **Key Customer**; or

    b. the termination or cancellation of any contract between **Insured** and a **Key Customer** as a result of:

        i. the cessation or suspension of the business operations of such **Key Customer**;

        ii. the death of such **Key Customer** or the bodily injury to or illness suffered by such **Key Customer** resulting in such **Key Customer's** inability to perform the same type of work

that such **Key Customer** performed prior to the bodily injury or illness;

iii.  the bankruptcy of such **Key Customer**;

iv.  the merger or consolidation with another organization such that the **Key Customer** is not the surviving organization, or the acquisition of more than 50% of the ownership interest of the **Key Customer** by another organization, or person, or group of organizations and/or persons acting in concert; or

v.  the adoption or promulgation of federal, state or local laws, regulations or ordinances, by any legislative body, executive authority or agency, affecting such **Key Customer's** business and resulting in increased costs or operating expenses, reduction in the **Key Customer's** business production capacity, or the **Key Customer's** withdrawal of a product or service from the market.

**Actual Net Loss** in connection with a Loss of Key Customer event shall include **Income Loss** and **Extra Expenses**, such as costs of cover, costs of advertising and marketing for new customers, travel, lodging, meal and entertainment expenses incurred in selection of a customer, and miscellaneous extra costs incurred in finding, meeting and negotiating with new customers including, but not limited to, costs to verify the background and references of prospective new customers, and overtime pay and legal expenses incurred to draw up customer contracts.

38.  "Loss of Key Employee" event, which means the loss of a **Key Employee** attributable to (a) bodily injury to such **Key Employee** resulting in such **Key Employee's** inability to perform the same type of work that such **Key Employee** performed prior to the bodily injury; (b) the illness of such **Key Employee** resulting in the loss of the services of the **Key Employee** for a period no less than 60 days; (c) the voluntary termination by such **Key Employee** of his or her employment with **Insured**; or (d) the death of such **Key Employee**. **Actual Net Loss** in connection with a Loss of Key Employee event shall include **Income Loss** and **Extra Expenses**, such as costs of advertising for new job applicants to replace the **Key Employee**, travel, lodging, meal and entertainment expenses incurred in selection of a new **Key Employee**; and miscellaneous extra costs incurred in finding, meeting and negotiating with a new **Key Employee** including, but not limited to, costs to verify the background and references of applicants, and overtime pay and legal expenses incurred to draw up employment contracts.

Case 3:19-cv-00522-FDW-DSC   Document 1-1   Filed 10/09/19   Page 20 of 38

39. "Loss of Key Supplier" event, which means:

   a. the wrongful termination or wrongful cancellation by a **Key Supplier** of any contract between **Insured** and such **Key Supplier**; or

   b. the termination or cancellation of any contract between **Insured** and a **Key Supplier** as a result of:

      i. the cessation or suspension of the business operations of such **Key Supplier**;

      ii. the death of such **Key Supplier** or the bodily injury to or illness suffered by such **Key Supplier** resulting in such **Key Supplier's** inability to perform the same type of work that such **Key Supplier** performed prior to the bodily injury or illness;

      iii. the bankruptcy of such **Key Supplier**;

      iv. the merger or consolidation with another organization such that the **Key Supplier** is not the surviving organization, or the acquisition of more than 50% of the ownership interest of the **Key Supplier** by another organization, or person, or group of organizations and/or persons acting in concert; or

      v. the adoption or promulgation of federal, state or local laws, regulations or ordinances, by any legislative body, executive authority or agency, affecting such **Key Supplier's** business and resulting in increased costs or operating expenses, reduction in the **Key Supplier's** business production capacity, or the **Key Supplier's** withdrawal of a product or service from the market.

   **Actual Net Loss** in connection with a Loss of Key Supplier event shall include **Income Loss** and **Extra Expenses**, such as costs of cover, costs of advertising and marketing for new suppliers or referral sources, travel, lodging, meal and entertainment expenses incurred in selection of a supplier or referral source, and miscellaneous extra costs incurred in finding, meeting and negotiating with new suppliers or referral sources including, but not limited to, costs to verify the background and references of prospective new suppliers or referral sources, and overtime pay and legal expenses incurred to draw up supplier or referral contracts.

40. "Loss of License/Certification – Medical Industry" event, which means the forfeiture, revocation, suspension, withdrawal or rejection of renewal of **Insured's** license to practice medicine, medical professional certification, admitting privileges or insurance credentials, or of any license, certification or credentials upon which **Insured** relies in the course of its operations. **Actual Net Loss** in connection with a

Case 3:19-cv-00522-FDW-DSC   Document 1-1   Filed 10/09/19   Page 21 of 38

Loss of License/Certification – Medical Industry event shall include **Income Loss** and **Extra Expenses**

41. "Loss of Licensure" event, which means the forfeiture, revocation, suspension, withdrawal or rejection of renewal of **Insured's** professional license or professional certification or a professional license or professional certification upon which **Insured** relies in the course of its business operations. **Actual Net Loss** in connection with a Loss of Licensure event shall include **Income Loss** and **Extra Expenses**.

42. "Loss of Liquor License" event, which means the forfeiture, revocation, suspension, withdrawal or rejection of renewal of **Insured's** license to sell or distribute liquor or alcoholic beverages. **Actual Net Loss** in connection with a Loss of Liquor License event shall include **Income Loss** and **Extra Expenses** in connection with such forfeiture, revocation, suspension, withdrawal or rejection of renewal.

43. "Loss of Market" event, which means the removal of a product or service sold or marketed by **Insured** or a supplier of such a product or service from an established market due to changes in such market such as changes in distribution methods and/or commercial practices. **Actual Net Loss** in connection with a Loss of Market event shall include **Income Loss** and **Extra Expenses** associated with such removal of a product, service and/or supplier.

44. "Loss of Referrals" event, which means the termination or cancellation of all or any part of a business relationship between **Insured** and any **Key Referral Source**. **Actual Net Loss** in connection with a Loss of Referrals event shall include **Income Loss** and **Extra Expenses**, such as costs of cover, costs of advertising and marketing for new referral sources, travel, lodging, meal and entertainment expenses incurred in selection of a replacement **Key Referral Source**, and miscellaneous extra costs incurred in finding, meeting and negotiating with new referral sources including, but not limited to, costs to verify the background and references of prospective new referral sources, and overtime pay and legal expenses incurred to draw up referral contracts.

45. "Loss of Rental Income" event, which means loss or damage to real rental property owned by **Insured** that makes such rental property uninhabitable. **Actual Net Loss** in connection with a Loss of Rental Income event shall include **Income Loss** and **Extra Expenses**.

46. "Loss of Use" event, which means the interruption or cessation of business of **Insured**, caused by a manufacturing defect in or recall of equipment owned by **Insured** or used in **Insured's** business operations. **Actual Net Loss** in connection with a Loss of Use event shall include **Income Loss** and **Extra Expenses**.

47. "Mechanical Breakdown" event, which means one of the following events causing direct physical damage to equipment, other than motor vehicles, watercraft or aircraft, that is owned or leased by **Insured** and used in **Insured's** business, such as electrical, mechanical, computer, communications, air conditioning, refrigeration, or boilers, necessitating the repair or replacement of such equipment:

   a. Mechanical breakdown, including rupture or bursting caused by centrifugal force;

   b. Artificially generated electrical current, including electrical arcing that damages electrical devices, appliances and/or wires;

   c. Explosion, other than combustion explosion, of steam boilers, steam piping, steam engines or steam turbines,

   d. An event inside steam boilers, steam piping, steam engines or steam turbines that damages such equipment;

   e. An event inside hot water boilers or other water heating equipment that damages such equipment; or

   f. Bursting, cracking or splitting.

   Ordinary wear and tear, depletion, deterioration, rust, corrosion, erosion or settling of equipment or the parts or instruments of such equipment do not qualify as a Mechanical Breakdown event. Loss or damage arising from misalignment, mis-calibration, tripping off-line, or any condition which can be corrected by resettling, tightening, adjusting or cleaning, or by the performance of maintenance does not qualify as a Mechanical Breakdown event. **Actual Net Loss** in connection with a Mechanical Breakdown event shall include **Income Loss**, **Extra Expenses** and **Covered Expenses**, including reasonable expenses incurred in repairing such equipment including parts and labor, and costs of renting temporary substitute equipment. **Actual Net Loss** shall not include costs incurred with respect to the performance of maintenance.

48. "Medicare Audit" event, which means the initiation of any **Administrative Action** or an audit by a private insurer related to an **Insured's** Medicare and Medicaid billing practices. In connection with a Medicare Audit event, **Actual Net Loss** shall include **Claims Expenses** and **Claims Losses** associated with such **Administrative Action** or audit; however, **Actual Net Loss** shall not include reimbursement for any payments for services that are refunded or returned by **Insured** or otherwise recovered from **Insured** by any state or federal government agency, body or authority, or any delegate thereof, or by any private insurer, pursuant to such **Administrative Action** or audit.

Case 3:19-cv-00522-FDW-DSC   Document 1-1   Filed 10/09/19   Page 23 of 38

49. "Medicare/Medicaid Reimbursement" event, which means (a) the rejection of **Insured's** application or request for reimbursement for services actually rendered by **Insured** pursuant to a Medicare or Medicaid program; provided that such services were reimbursable under such Medicare or Medicaid program as of the **Effective Date**; or (b) a reduction in amounts payable to **Insured** under any Medicare or Medicaid reimbursement schedule from the amounts payable for such services as of the **Effective Date**. **Actual Net Loss** in connection with a Medicare/Medicaid Reimbursement event shall include **Income Loss** and **Extra Expenses** arising from the rejection of **Insured's** application or request for reimbursement or from the reduction in amounts payable to **Insured**.

50. "Political Risk" event, which means an event causing or arising from social or political instability within a given country which causes one of the following losses or expenses to the **Insured**:

   a. losses resulting from expropriation, confiscation, deprivation and nationalization of such **Insured's** assets;

   b. losses to property owned by **Insured**, or for which **Insured** otherwise bears the risk of loss;

   c. losses resulting from the frustration of contracts to which such **Insured** is a party;

   d. losses resulting from inconvertibility and non-transfer of local currency, including interruption of scheduled interest payments or repatriation of capital or dividends due to currency restrictions imposed by a foreign government;

   e. sovereign payment defaults; or

   f. wrongful calling of on-demand contract guarantees and/or bonds.

   A Political Risk event shall be deemed to first occur when **Insured** has, or reasonably should have, knowledge of **Actual Net Loss** arising from such social or political instability. **Actual Net Loss** in connection with a Political Risk event shall include **Income Loss**, **Extra Expenses** and **Covered Expenses**, including losses resulting from expropriation, confiscation, deprivation and nationalization of such **Insured's** assets, frustration of contracts to which such **Insured** is a party, inconvertibility and non-transfer of local currency, sovereign payment defaults, wrongful calling of on-demand contract guarantees and/or bonds, and loss or damage to **Insured's** assets due to political violence.

51. "Privacy Liability" event, which means the initiation of a **Claim** based on actual or alleged neglect, breach of duty or omissions by **Insured**, which causes the unauthorized publication by a non-**Insured** of an **Insured's** client's personal or proprietary information which was held

in **Insured's** possession other than personal information held in **Insured's** computer system. **Actual Net Loss** in connection with a Privacy Liability event shall include **Claims Expenses** and **Claims Losses** arising from such **Claim**.

52. "Private Carrier Reimbursement" event, which means (a) the rejection of **Insured's** application or request for reimbursement for services rendered by **Insured** from any insurance carrier other than a Medicare or Medicaid insurer, as a result of a change to such carrier's reimbursement schedule; or (b) a reduction in amounts payable for services rendered by **Insured** by any insurance carrier as a result of a change to such **Insured's** reimbursement schedule. **Actual Net Loss** in connection with a Private Carrier Reimbursement event shall include **Income Loss** and **Extra Expenses** arising from the rejection of **Insured's** application or request for reimbursement or from the reduction in amounts payable to **Insured**.

53. "Product Contamination" event, which means the removal from production, distribution, sale, users or consumers of **Insured's Products** or **Impaired Property** for inspection, disposal, destruction, replacement or modification arising from:

    a. accidental or unintentional contamination, impairment or mislabeling which occurs during or as a result of the production, manufacture, processing, blending, mixing, compounding, packing or distribution of such products or property;

    b. diseases or illnesses resulting in the destruction of livestock; or

    c. any actual, alleged, or threatened, intentional, malicious, and wrongful alteration or contamination by any employee or third person, so as to render such products unfit or dangerous for its intended use or consumption or to create such impression to the public.

    **Actual Net Loss** in connection with a Product Contamination event shall include **Income Loss**, **Extra Expenses** and **Covered Expenses**.

54. "Product Recall Expense" event, which means the removal from production, distribution, sale, users or consumers of **Insured's Products**, **Insured's Work** or **Impaired Property** for inspection, disposal, replacement or modification arising out of defects in or safety concerns regarding such **Insured's Products**, **Insured's Work** or **Impaired Property**. **Actual Net Loss** in connection with a Product Recall Expense event shall include **Income Loss**, **Extra Expenses**, and **Covered Expenses**, including but not limited to the costs of public relations consultants, service providers and campaigns.

Case 3:19-cv-00522-FDW-DSC   Document 1-1   Filed 10/09/19   Page 25 of 38

55. "Property, Difference in Conditions" event means physical loss or damage to **Insured's** property that would be covered by a commercial property **Covered Policy** but for: (a) the application of an exclusion listed in such **Covered Policy**; or (b) the exhaustion of policy limits in such **Covered Policy**. **Actual Net Loss** in connection with a Property, Difference in Conditions event shall include **Covered Expenses**, including the costs of repairing or replacing such lost or damaged property.

56. "Regulatory (Cargo): Federal/Interstate/FAA" event, which means any **Administrative Action** initiated by any state or federal agency regulating transportation or shipping or its delegate, resulting in the forfeiture, revocation, suspension, withdrawal or rejection of renewal of **Insured's** permit to transport certain goods or classes of goods. **Actual Net Loss** in connection with a Regulatory (Cargo): Federal/Interstate/FAA event shall include **Income Loss**, **Extra Expenses** and **Covered Expenses**, including assessments, fines, penalties, sanctions, and other costs to ensure compliance with state and federal rules, regulations, standards or contractual requirements arising from such **Administrative Action**.

57. "Regulatory Defense Costs Related to the Medical Industry" event, which means the initiation of an **Administrative Action** related to the provision of medical services by **Insured** or any employee thereof. **Actual Net Loss** in connection with a Regulatory Defense Costs Related to the Medical Industry event shall include **Claims Expenses** associated with such **Administrative Action** but does not include **Claims Losses**.

58. "Representations and Warranties" event, which means the initiation of a **Claim** against **Insured** by any party to a written contract with **Insured** for the sale or lease of a business, land, residential real estate or commercial real estate, alleging the breach of a representation or warranty contained in such contract, or errors, omissions or misstatements in connection with such representation or warranty. **Actual Net Loss** associated with a Representations and Warranties event shall include **Claims Expenses**, **Claims Losses** and **Covered Expenses**, including but not limited to expenses incurred to satisfy any obligation contained in such contract and/or indemnify any party to such contract.

59. "Reputational Risk" event, which means the publication, in print or electronic form, by a third party of information that damages or has the potential to damage the reputation of **Insured**. **Actual Net Loss** in connection with a Reputational Risk event shall include **Income Loss**, **Extra Expenses** and **Covered Expenses**, including the expense of crisis management, public relations, law or a similar firm engaged to defend or mitigate damage to **Insured's** reputation, and the cost of

Case 3:19-cv-00522-FDW-DSC   Document 1-1   Filed 10/09/19   Page 26 of 38

print or electronic media needed to assist **Insured** in defending or mitigating damage to its reputation.

60. "Suppliers/Supply Chain Interruption" event, which means the interruption or cessation of **Insured's** business for a period of not less than 24 hours, as a result of the interruptions to the business of any supplier or customer of **Insured**, caused by interruptions not arising from damage to such supplier or customer's property, such as strikes, riots, ingress/egress, pandemics, technology outages, or software failures. **Actual Net Loss** in connection with a Suppliers/Supply Chain Interruption event shall include **Income Loss** and **Extra Expenses**, such as costs of cover, costs of advertising and marketing for new suppliers or customers, travel, lodging, meal and entertainment expenses incurred in selection of a new supplier or customer, and miscellaneous extra costs incurred in finding, meeting and negotiating with a new supplier or customer including, but not limited to, costs to verify the background and references of prospective new suppliers or customers, and overtime pay and legal expenses incurred to draw up supplier or customer contracts.

61. "Subcontractor Default" event, which means: (a) the initiation of a **Claim** alleging an error or omission by a **Subcontractor** in connection with services provided to a customer of, or in connection with, an **Insured**; or (b) the material breach or a series of material breaches by **Subcontractor** of its obligations to **Insured** of such magnitude that **Insured** is justified in terminating its contract with **Subcontractor**. **Actual Net Loss** in connection with a Subcontractor Default event includes **Claims Expenses**, **Claims Losses** and **Covered Expenses**, including: (a) costs and expenses incurred in fulfilling the defaulting **Subcontractor's** contractual obligations regarding performance or payment; (b) costs and expenses related to correction of non-conforming work for which the defaulting **Subcontractor** was responsible; (c) consultant fees to remedy the **Subcontractor's** default; (d) delay damages or liquidated damages due to any customer of **Insured**; (e) acceleration costs; and (f) additional overhead costs and expenses.

62. "Trade Credit" event, which means loss of sums due from customers, clients or patients of **Insured**, provided that **Insured** is unable to effect collection thereof as a direct result of (1) the bankruptcy of the customer, client or patient; (2) the destruction of records or documents evidencing such sums due; (3) the termination or suspension of the customer or client's business operations; and/or (4) the protracted default of the customer, client or patient. A Trade Credit event shall be deemed to first occur when **Insured** reasonably deems such sums uncollectible. In connection with a Trade Credit event, **Actual Net Loss** shall include the invoice value of lost sums due and **Covered Expenses** incurred by **Insured** in connection with such Trade Credit event, including:

<ol type="a" start="1">
<li>interest charges paid by **Insured** on any loan to offset impaired collections pending repayment of such sums made uncollectible by the bankruptcy of the customer, client or patient; and</li>
<li>collection expense paid by **Insured** in excess of normal collection costs made necessary because of the bankruptcy of the customer, client or patient.</li>
</ol>

<ol start="63">
<li>"Transit Risk" event, which means loss or damages to equipment, supplies, materials, parts or any other goods, which are owned by **Insured** or for which **Insured** bears the risk of loss, incurred while such equipment, supplies, materials, parts or any other goods are being transported.  **Actual Net Loss** in connection with a Transit Risk event shall include **Covered Expenses**.</li>
<li>"Workplace Violence" event, which means incidents of violence at **Insured's** workplace, including physical assaults and threats of assault directed toward persons at work or on duty.  **Actual Net Loss** in connection with a Workplace Violence event shall include **Income Loss**, **Extra Expenses** and **Covered Expenses**, including public relations expenses, temporary security measures, and death benefits to families of victims.</li>
</ol>

HH. Subcontractor:  A third party hired by, engaged by, or working in coordination with **Insured** with respect to the services provided to a client or customer of **Insured.**

## II. PREMIUM

A. **Insured** is responsible for payment of premium to **Company** in the amount provided in the Declarations.

B. The premium payment shall be made to **Company** as per the instructions provided in the invoice issued by **Company**.

## III. INSURING AGREEMENT

A. Subject to the limits, conditions and exclusions contained in this **Policy**, and to any applicable **Deductible**, Company will pay **Insured** the amount of **Actual Net Loss** arising from any **Scheduled Event** that first occurs during the **Policy Period** and is reported during the **Policy Period** or the **Grace Period**. **Company's** liability to pay such sums will attach as of the receipt of notification of the **Scheduled Event** in accordance with Section V of this **Policy**.  If such notification is made during the **Grace Period**, such notification will be deemed to have been made on the last day of the **Policy Period**.

B. The insurance provided under this **Policy** shall be excess over any amounts covered by any other valid and collectible insurance issued to **Insured**, including any **Covered Policy**.  **Company** will pay **Insured** up to the amount of **Insured's** deductible(s) under any insurance policy applied to the **Scheduled Event** and amounts in excess of the policy limit(s) applied to the **Scheduled Event**.

Subject to Section III.D of this **Policy**, coverage by **Company** shall be primary only when **Insured** has no other insurance coverage to apply to the **Scheduled Event**.

C. The insurance afforded by any **Covered Policy** shall be maintained for the full term of this insurance. As each **Covered Policy** expires, **Insured** shall renew it at limits equal to or greater than the expiring limits and for causes of loss equal to or broader than the expiring causes of loss.

D. If the **Insured** fails to comply with the provisions in Section III.C, **Company** will pay **Insured** only to the extent that **Company** would have paid had **Insured** complied with the requirements in Section III.C.

E. **Insured** acknowledges and understands that **Company** has ceded or will cede 100% of the liabilities assumed under this **Policy** to various reinsurers. **Company** shall be liable for payment of **Actual Net Loss** only to the extent that it has collected proceeds from its reinsurers to pay such **Actual Net Loss**. In the event that this policy is cancelled pursuant to Section VIII of this **Policy**, **Company** will be liable for refunds only to the extent that it has collected refunds from its reinsurers with respect to such cancellation.

F. The **Deductible** shall apply first to any amounts payable by **Company** to **Insured** with respect to any **Scheduled Event**. A separate **Deductible** shall apply to each occurrence of a **Scheduled Event**.

IV. LIMITS

A. In no event shall the amount paid by **Company** with respect to any occurrence of a **Scheduled Event** exceed the amount listed as the **Limit of Liability Per Occurrence** in the Declarations of this **Policy**. A **Scheduled Event** affecting multiple **Insureds** shall be treated as a single occurrence of a **Scheduled Event**. Multiple **Scheduled Events** arising from the same facts, circumstances, transaction or occurrence will be treated as a single occurrence of a **Scheduled Event**, and if multiple **Scheduled Events** have been triggered by such facts, circumstances, transaction or occurrence, then **Insured** may elect which **Scheduled Event** has been triggered for purposes of determining the applicable **Limit of Liability Per Occurrence**. Losses under the multiple **Scheduled Events** may be aggregated for the purpose of reaching the single applicable **Limit of Liability Per Occurrence**.

B. In no event shall the total amount paid by **Company** under this **Policy** exceed the amount listed as the **Aggregate Limit of Liability** in the Declarations of this **Policy**.

V. CLAIMS PROCESS

A. <u>Reporting Period</u>. Within 30 days of when **Insured** first has knowledge of the occurrence of a **Scheduled Event**, but in any event during the **Policy Period** or **Grace Period**, **Insured** shall notify **Company** in writing of the occurrence of the

**Scheduled Event**. If such notification occurs after the expiration of the **Grace Period**, then **Company** shall have no obligation to pay the sums contemplated by Section III of this **Policy**.

B. <u>Contents of Notification</u>. The notification of the **Scheduled Event** shall include the following information:

    1. Name of **Insured**;

    2. A description of the **Scheduled Event**; and

    3. The **Covered Policy** or **Covered Policies** associated with the **Scheduled Event** that resulted in the **Actual Net Loss** or that exclude(s) the peril associated with the **Actual Net Loss**, if any.

C. <u>Additional Duties of Insured</u>. Following the notification described in this Section V, **Insured** shall:

    1. if its business operations have been suspended or interrupted, partially or completely, resume business to the extent possible and as soon as possible after the occurrence of the **Scheduled Event**;

    2. take all reasonable steps to mitigate **Actual Net Loss**;

    3. keep a record of any expenses for which **Insured** wants reimbursement in connection with such **Scheduled Event**;

    4. complete any claim form(s) provided by **Company** and submit the completed form(s) to **Company**, along with documentation demonstrating evidence of payment;

    5. cooperate fully with **Company** and its representatives in the investigation of the **Actual Net Loss**; and

    6. afford **Company** reasonable access to **Insured's** premises and financial records.

D. <u>Payment</u>.

    1. Within 30 days of receipt of the completed claim form(s) referenced in Section V.C.4, along with the documentation described in Section V.C.4, **Company** will pay **Insured** pursuant to Section III of this **Policy** if:

        a. **Insured** has complied with all of the terms of this **Policy**; and

        b. either:

            i. **Company** and **Insured** have reached an agreement on the amount of the payment; or

            ii. a judgment setting the amount of the payment has been made.

2. All claims will be considered paid in full and closed without any right to further payment 60 days after **Insured** receives written notice from **Company** that the claim has been closed either as a result of payment having been made or an **Insured** not having provided information to substantiate its claim.

## VI. EXCLUSIONS

This **Policy** does not apply to any **Actual Net Loss** related to or caused directly or indirectly by:

A. any fact, circumstances, situation, transaction, threatened **Claim** or **Administrative Action** or event which, as of the **Initial Effective Date**, **Insured** knew or reasonably should have known would be likely to result in the occurrence of a **Scheduled Event**;

B. any **Claim** or **Administrative Action** arising out of an act or omission that actually or allegedly occurred prior to the **Retroactive Date**;

C. any **Claim** made by an **Insured** against another **Insured**;

D. any action taken by **Insured**, individually or in concert with others, that is intended by **Insured**, or that can be expected from the standpoint of a reasonable person, to cause an **Actual Net Loss** to **Insured**;

E. any expense, loss, penalty or fine paid by **Insured** related to or caused by **Insured's** knowing or willful violation of law, regulation, or court order;

F. war, declared or undeclared, or any act or incident of war;

G. violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the United States by coercion;

H. riot or civil commotion; however, this exclusion shall not apply to **Scheduled Events** 50, 60 or 64.

I. nuclear reaction, nuclear radiation, or radioactive contamination, however such nuclear reaction, nuclear radiation or radioactive contamination may have been caused;

J. with respect to **Scheduled Event** 55, wind and/or hail;

K. any actual, alleged or threated exposure to, or generation, storage, transportation, discharge, emission, release, dispersal, escape, treatment, removal or disposal of any **Pollutant**; however, this exclusion shall not apply to **Scheduled Event** 23;

L. earthquake; however, this exclusion shall not apply to **Scheduled Event** 63;

Case 3:19-cv-00522-FDW-DSC Document 1-1 Filed 10/09/19 Page 31 of 38

M. surface water, mudslide or mudflow, water that backs up or overflows from a sewer, drain or pump, or water under the ground surface pressing on, flowing or seeping through foundations, walls or paved surfaces, basements (whether paved or not) or doors, windows or other openings; provided, however that this exclusion shall not apply to **Scheduled Events** 6, 9 or 60;

N. flood, waves (including tidal wave and tsunami), tides, tidal water, overflow of any body of water, or spray from any of these; provided, however that this exclusion shall not apply to **Scheduled Events** 6, 9 or 60;

O. any form of fungus, including mold or mildew, and any mycotoxins, spores, scents or by-products produced or released by fungi;

P. loss or damage to contraband;

Q. property that is missing, where the only evidence of the loss or damage is a shortage disclosed on taking inventory, or other instances where there is no physical evidence to show what happened to the property;

R. the voluntary parting with property by **Insured** or anyone to whom **Insured** has entrusted such property if induced to do so by any fraudulent scheme, trick, device or false pretense;

S. the failure of **Insured** to protect its computer system by network security equal to or superior to that discussed in response to questions asked by **Company** or its affiliates in connection with **Company's** assumption of risk under this **Policy**;

T. the failure of **Insured** to apply credit standards equal to or superior to that discussed in response to questions asked by **Company** or its affiliates in connection with **Company's** assumption of risk under this **Policy**;

U. the failure of **Insured** to use best efforts to (1) install commercially available software product updates and releases; and (2) to apply security related software patches to computers and other components of **Insured's** computer system;

V. with respect to **Scheduled Events** 36, 37, 38, 39 and 44, the cancellation, termination or nonrenewal of any contract or business relationship by an **Insured**;

W. with respect to **Scheduled Events** 36, 37, 38, 39 and 44, the termination or nonrenewal of any contract arising from the gross negligence or fraud of **Insured** or **Insured's** failure to perform in accordance with contract specifications;

X. the failure of **Insured** to use commercially reasonable security measures to secure paper files;

Y. any liability of **Insured**, or any obligation of **Insured** to indemnify any party, or any **Claim** or **Administrative Action** relating to property damage, personal injury, sickness, disease, occupational disease, disability, shock, death, mental

anguish or mental injury at any time arising out of the manufacture of, mining of, use of, sale of, installation of, removal of, distribution of, or exposure to asbestos, asbestos products, asbestos fibers or asbestos dust;

Z. costs, fees, or expenses in submitting or prosecuting a claim under this **Policy**, including questions as to what is covered under this **Policy**;

AA. any **Claim** alleging injury arising out of an electronic chat room or bulletin board which is hosted or owned by **Insured** or over which **Insured** otherwise exercises control;

BB. any dishonest or deliberately fraudulent act of an **Insured**; provided, however that this exclusion BB shall not apply unless and until there is a final judgment against **Insured** as to such conduct;

CC. the gaining of any profit, remuneration, or financial advantage to which **Insured** was not legally entitled; provided, however that this exclusion CC shall not apply unless and until there is a final judgment against **Insured** as to such conduct; and

DD. any liability arising out of an action taken by an **Insured** that is intended by **Insured**, or can be expected from the standpoint of a reasonable person, to cause injury, even if the injury is of a different degree or type than intended or expected.

VII. DISPUTE RESOLUTION

A. <u>Action Against Company</u>. No person or organization, including but not limited to **Insured**, has a right under this **Policy**:

1. to join **Company** as a party to any action or lawsuit against any **Insured** or to otherwise bring **Company** into a suit asking for damages from any **Insured**; or

2. to sue **Company** with regard to this **Policy** unless **Insured** has complied with all the terms of the **Policy**.

B. <u>Forum</u>. Any suit or action brought to enforce this **Policy** or any rights granted pursuant to this **Policy** may be brought only in courts located within the State of North Carolina. **Company** and **Insured** hereby agree that such courts will have venue and exclusive subject matter and personal jurisdiction, and consent to service of process by registered mail, return receipt requested, or by any other manner provided by law, and agree that the party to this **Policy** prevailing in such suit or action will be entitled to all costs of such suit or action, including reasonable attorney's fees.

VIII. CANCELLATION

A. **Insured** may cancel this **Policy** at any time by sending **Company** a written notice signed by an authorized officer or representative of **Insured** stating the date that the cancellation will be effective, which shall be the **Cancellation Date**.

Case 3:19-cv-00522-FDW-DSC   Document 1-1   Filed 10/09/19   Page 33 of 38

If the notice does not specify a date that the cancellation will be effective, the **Cancellation Date** will be the date that the notice of cancellation is received by **Company**.

B. **Company** may cancel the **Policy** providing by certified mail to the **Named Insured** written notice of cancellation, which must include the effective date of cancellation to be effective; provided that in the event of cancellation for non-payment of premium, written notice may be delivered by means other than certified mail. This **Policy** may be cancelled for any reason for which **Company** is entitled to cancel the **Policy** pursuant to North Carolina General Statutes §58-41-15. The effective date of cancellation provided in the notice shall be the **Cancellation Date**. Notice to **Named Insured** of cancellation shall be mailed at least:

   1. 10 days before the **Cancellation Date** if **Company** cancels for nonpayment of premium;

   2. 10 days before the **Cancellation Date** if Company cancels due to increased hazard or material change in the risk assumed under this **Policy**; or

   3. 30 days before the **Cancellation Date** for any other reason permitted under the North Carolina General Statutes or any regulations related thereto.

C. In the event that this **Policy** is cancelled, then **Company** will refund premium pro-rata, less the amount of any payments made to **Insured** under this **Policy** and the reasonable costs incurred by **Insured** to administer this **Policy**.

D. Cancellation of this policy will not change **Company's** obligations with respect to any **Scheduled Event** that was reported to **Company** before the **Cancellation Date**. In the event that this **Policy** is cancelled, no **Grace Period** shall apply.

IX.   GENERAL PROVISIONS

A. Construction of Policy. The objective of this **Policy** is to provide insurance coverage for fortuitous events and not for repeatedly recurring events. This **Policy** shall be interpreted so as to give effect to this objective.

B. No Third Party Beneficiary. The provisions of this **Policy** are solely for the benefit of **Insured** and **Company** and their respective assigns and may be enforced only by **Insured** and **Company** and their respective assigns. There are no third-party beneficiaries to this **Policy**. **Company** will make no payments to any party other than **Insured**, and no party other than **Insured** (and its assigns) shall have the right to enforce the obligation of **Company** to make any payments to **Insured**.

C. Subrogation and Salvage.

   1. If **Insured** has rights to recover damages from a third party related to an **Actual Net Loss** for which **Company** makes payment under this

**Policy**, those rights are transferred to **Company** to the extent of **Company's** payment. **Insured** shall take any and all action to secure **Company's** rights and may do nothing after learning of the **Scheduled Event** to impair them.

2.    **Company** is entitled to recover from **Insured** all or part of any payment made under this **Policy** which the **Insured** subsequently is paid or recovers from another party, including income received from a contract that was subject to a Continuing Resolution event (see **Scheduled Event** 10).

D. <u>Amendments</u>. This **Policy** may only be amended by an endorsement executed by an authorized representative of **Company**; provided, however that no endorsement that reduces coverage, increases the premium due, or otherwise materially changes the terms of this **Policy** shall be effective unless **Named Insured** consents to such endorsement.

E. <u>Entire Agreement</u>.   This **Policy** constitutes the entire agreement between **Insured** and **Company** with respect to the matters covered herein. This **Policy** supersedes all prior and contemporaneous agreements and oral understandings among **Insured** and **Company** with respect to such matters.

F. <u>Choice of Law</u>. This **Policy** and all questions with respect to the rights and obligations of **Company** and **Insured**, the construction, enforcement, and interpretation hereof, shall be governed by the laws of the State of North Carolina, without regard to conflict of laws provisions.

G. <u>Bankruptcy</u>.  The bankruptcy or insolvency of **Insured** will not relieve **Company** of any obligation under this **Policy**.

H. <u>Concealment, Misrepresentation and Fraud</u>.

1.    Any fraud, misrepresentation, concealment or nondisclosure with respect to (a) information provided to **Company** or its affiliates in connection with the acceptance of risk under this **Policy**; or (b) information provided with respect to the reporting of a **Scheduled Event** or **Actual Net Loss** pursuant to Section V of this **Policy** shall render this **Policy** void.

2.    If this **Policy** is voided pursuant to Section IX.H.1, **Insured** will be liable to refund to **Company** any payments **Company** may have made to **Insured** under this **Policy**.

I. <u>Inspection of Insured's Records</u>.  **Company** may examine and audit the books and records of **Insured** as it may relate to this **Policy** at any time during the **Policy Period** and up to three years after the date of any payment made by **Company** under this **Policy**.

J. <u>Changes in Exposure</u>.  If, during the **Policy Period**, any **Insured** merges into or consolidates with another organization such that **Insured** is not the surviving organization; or if another organization, or person, or group of organizations

Case 3:19-cv-00522-FDW-DSC   Document 1-1   Filed 10/09/19   Page 35 of 38

and/or persons acting in concert acquires more than 50% of the ownership interest of any **Insured**, then, at **Company's** option, coverage under this **Policy** will end as of the date and time ownership, control or affiliation was transferred to the other party. **Insured** must give **Company** written notice of such merger, consolidation or acquisition as soon as practicable, together with such information as **Company** may reasonably request.

K. Assignment. No **Insured** may assign any of its interest in or rights under this **Policy** without the prior written consent of **Company**.

L. Headings. Headings and section titles in this **Policy** have been included for convenience only and form no part of the terms and conditions of this **Policy**.

M. Application of Provisions of Scheduled Events. Any right of **Company** to cancel, void or endorse coverage under this **Policy** may be applied to the **Policy** as a whole or, at **Company's** discretion, to one or more **Scheduled Events** without disturbing any other provision of the **Policy**.

N. Authorization. By acceptance of this **Policy**, all **Insureds** agree that the **Named Insured** identified in the Declarations shall act on behalf of all **Insureds** with respect to all obligations under the **Policy**.

## X.   NOTICE

Any notice or other communication to **Company** under this **Policy** shall be in writing and shall be deemed given upon receipt by **Company** at the mailing address set forth below or at such other address or email address as **Company** shall hereafter furnish in writing to **Insured**.

> Series 1 of Oxford Insurance Company NC LLC
> c/o Oxford Management Company LLC
> 954 Ridgebrook Road, Suite 100
> Sparks, MD 21152

Case 3:19-cv-00522-FDW-DSC   Document 1-1   Filed 10/09/19   Page 36 of 38

## ENDORSEMENT

This endorsement, effective on 12/30/2017 at 12:01 a.m., forms a part of:

Policy Number:      BSL-17-NC

Issued to:          Buckley Sandler, LLP

By:                 Series 1 of Oxford Insurance Company NC LLC

### EXCLUDED DEDUCTIBLE ENDORSEMENT
### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

Terms in **bold** shall have the definitions provided in Policy BSL-17-NC (the **Policy**), into which this Endorsement #1 is incorporated.

This endorsement modifies the insurance provided under the **Policy** by adding the following Section VI.EE (Exclusions):

      EE.    with respect to **Scheduled Events** 14, 15, 16, and 17, any actual loss, damage or expenses under a **Covered Policy** with a deductible less than or equal to $2,500.

**SERIES 1 OF OXFORD INSURANCE COMPANY NC LLC**

By: _____

Mary Claire Goff
Authorized Person

Case 3:19-cv-00522-FDW-DSC   Document 1-1   Filed 10/09/19   Page 37 of 38

## ENDORSEMENT

This endorsement, effective on 12/30/2017 at 12:01 a.m., forms a part of:

Policy Number:     BSL-17-NC

Issued to:            Buckley Sandler LLP

By:                      Series 1 of Oxford Insurance Company NC LLC

## AGGREGATE DEDUCTIBLE ENDORSEMENT
### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

Terms in **bold** shall have the definitions provided in Policy BSL-17-NC (the **Policy**), into which this Endorsement #2 is incorporated.

This endorsement modifies the insurance provided under the **Policy** by adding the following subsection EE to Section VI (Exclusions):

EE.    With respect to **Scheduled Event 38**, the voluntary termination by any of the following individuals of his employment with **Insured**:

1. Benjamin B. Klubes
2. David S. Krakoff
3. John P. Kromer
4. Jeffrey P. Naimon
5. Andrew L. Sandler
6. Christopher M. Witeck

SERIES 1 OF OXFORD INSURANCE
COMPANY NC LLC

By: _____

Mary Claire Goff
Authorized Person

Case 3:19-cv-00522-FDW-DSC   Document 1-1   Filed 10/09/19   Page 38 of 38