# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF NORTH CAROLINA
## CHARLOTTE DIVISION
## DOCKET NO. 3:19-CV-00522-FDW-DSC

SERIES 1 OF OXFORD INSURANCE
COMPANY NC, LLC,

              Plaintiff,

              v.

BUCKLEY LLP,

              Defendant.

## DECLARATION OF JOSHUA D. DAVEY

I, Joshua D. Davey, declare as follows:

1.      I am a partner at McGuireWoods LLP and counsel to Defendant Buckley LLP in this action.

2.      Exhibit A to this Declaration is a true and correct copy of the complaint (without exhibits) filed in *Buckley LLP v. Series 1 of Oxford Insurance Company NC, LLC*, Case No. 19-CVS-21128, in the Mecklenburg County, North Carolina Superior Court.

I declare under penalty of perjury that the foregoing is true and correct. Executed on October 30, 2019, in Charlotte, North Carolina.

_____
Joshua D. Davey

# EXHIBIT A

STATE OF NORTH CAROLINA
COUNTY OF MECKLENBURG

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
Case No.:
19 CVS 21123

BUCKLEY LLP,

    Plaintiff,

v.

SERIES 1 OF OXFORD INSURANCE
COMPANY NC LLC,

        Defendant.

**COMPLAINT**

Buckley LLP ("Buckley" or the "Firm"), previously known as Buckley Sandler LLP,

by and through counsel, asserts its claims against Series 1 of Oxford Insurance Company NC

LLC ("Oxford") and seeks relief for Oxford's breaches of contract, unfair and deceptive

trade practices, breach of the duty of good faith and fair dealing, and tortious refusal to settle

an insurance claim. This is no ordinary dispute about insurance coverage. Oxford's conduct

as described in the following paragraphs is reprehensible and falls far below the minimum

standards of good faith and fair dealing expected in business and breaches the duties an

insurer owes to its insured. Such misconduct can only be understood as a concerted effort by

Oxford to deprive Buckley of the coverage it paid for and to violate Oxford's duty to its

insured through deception and unfair practices.

In 2014, as part of a larger assessment of potential risks facing law firms generally,

Buckley implemented a program to insure the Firm against losses associated with the

departure of key, revenue-generating partners. Buckley insured this risk through different

insurance companies over the years. In late 2017, Oxford accepted a premium of $1.1

1

million from Buckley to provide "loss of key employee" insurance (as part of a policy for which Buckley paid $6 million) in the event that any of Buckley's key partners, including a founding partner and then-Chairman, Andrew L. Sandler, voluntarily left the Firm. In March 2018, Mr. Sandler voluntarily resigned after refusing to cooperate with an investigation by the Firm into his conduct. When Buckley informed Oxford that it would submit an insurance claim in connection with Mr. Sandler's resignation (the "Claim"), Oxford's immediate reaction, without knowing any facts, was to tell Buckley not to submit the Claim, because Oxford had no intention to pay it. After Buckley submitted the Claim anyway, Oxford proceeded to slip into the insurance policy—without Buckley's knowledge or consent—an "Endorsement 2" that purported to invalidate the key-employee coverage for which Buckley had just paid Oxford $1.1 million. Buckley caught Oxford red-handed, forcing Oxford to withdraw Endorsement 2 (although, amazingly, Oxford attempted the same scam a year later). After its attempts to derail Buckley's Claim had been thwarted a second time, Oxford had no alternative but to consider the Claim on the merits. Oxford, however, still proceeded in a concerted effort to cheat Buckley out of the coverage it had paid for.

Given the requests for anonymity, confidentiality, and privacy from individuals involved in Buckley's investigation of Mr. Sandler (due, in part, to their concerns about potential retaliation by Mr. Sandler) as well as the commercially sensitive Firm information Buckley expected to provide Oxford in connection with the Claim, Buckley and Oxford entered into a nondisclosure agreement on September 28, 2018 (the "Nondisclosure Agreement") forbidding Oxford from disclosing any information it received from Buckley about the Claim. To support its Claim, Buckley then met with Michael DiMayo, President of Oxford Risk Management Group ("ORMG"), which controls and directs the activities of

2

Oxford. Buckley answered Mr. DiMayo's questions, and provided additional information and data, including a timeline of key events, in response to his requests. After considering the additional information Buckley provided, Mr. DiMayo notified Buckley in writing that Oxford had approved coverage. The only remaining question was the amount of Buckley's loss. When Buckley submitted financial information showing that it was entitled to full coverage at the Policy limit of $6 million, Oxford backpedaled furiously, suggesting that Buckley had forced Mr. Sandler to resign (apparently based on inaccurate statements by Mr. Sandler), offering Buckley about one-sixth of its losses without any analysis to show it was a fair offer, and threatening to refer the matter to a third party for investigation, which would allow Oxford to delay the outcome indefinitely, unless Buckley took the offer. Buckley rejected it.

Following through on its threat, Oxford referred the Claim to a third party and tried to justify this decision by telling Buckley that it had submitted "contradictory" information to Oxford. Although Buckley repeatedly asked Oxford to identify the "contradictory" information so it could address the alleged "contradictions," Oxford refused. Oxford also insisted that its established claim procedures required a referral to an "independent" third party, but refused to provide the claim procedures to Buckley, instead providing Buckley with multiple, inconsistent explanations of what those procedures required.

The so-called "independent" investigation was conducted by a claims adjuster, Thomas Ricci, of the Curley Adjustment Bureau ("Curley"). At the same time, Oxford's outside counsel at Womble Bond & Dickinson (US) LLP ("Womble") began interacting with both Buckley and Mr. Ricci. Oxford and Womble indicated that failure to cooperate with Mr. Ricci's investigation would violate Buckley's cooperation obligation under the Policy

3

and invalidate coverage. Although Buckley disagreed—after all, Oxford had already approved coverage so further investigation was unnecessary—it nonetheless cooperated with Mr. Ricci's investigation. Buckley's cooperation was met by an investigation tantamount to sophisticated, one-way, civil discovery against Buckley, with interrogatory-style questions requiring written responses, requests for production of documents, and demands for sworn interviews before court reporters of more than a dozen current and former Buckley lawyers.

Oxford repeatedly assured Buckley that Mr. Ricci would conduct an "unbiased" and "independent" investigation. Far from being "unbiased," Mr. Ricci only sought to discover information that he thought could undermine the Claim. Nor was he "independent." Womble spoke for him, scheduled his interviews, served discovery requests for him, and equated Oxford with the "independent" "third party" investigator—stating that "Oxford continues to work diligently" on the supposedly "independent" investigation. Suspicious that Womble and Oxford had devised this discovery and were directing and controlling the "independent" investigator, Buckley continued to request a copy of the procedures under which they claimed to be operating, but they repeatedly refused to produce them. Faced with the threat of denial of its Claim for lack of "cooperation," Buckley provided extensive sensitive data about the Firm and its investigation of Mr. Sandler—all under the protection of the Nondisclosure Agreement.

Despite Buckley's multiple requests, as the insured, for a reasoned analysis of its Claim, Mr. Ricci did not provide one to Buckley. Neither did Oxford. Buckley learned that the "independent" investigation had concluded only by reading about it in a lawsuit Oxford filed against Buckley to avoid coverage.

4

In addition, in filing its lawsuit against Buckley, Oxford publicly disclosed Buckley's confidential information and brazenly violated the Nondisclosure Agreement—with no regard for the privacy interests of individuals who, as Buckley had informed Oxford, had requested confidentiality and feared potential retaliation by Mr. Sandler—thereby triggering a round of adverse publicity. Oxford did not give Buckley advance notice of the lawsuit; to the contrary, Oxford falsely assured Buckley less than two weeks before filing suit that its "sole desire is to make a fair claim determination," that it was working to "analyze and process" the Claim, and that it would "provide [Buckley] with updates." In fact, Oxford preyed upon Buckley's patience to draft a complaint and race to the courthouse. To make matters worse, Oxford was in such haste to sue Buckley that it filed in a court that lacks subject matter jurisdiction. If Oxford had conducted the minimal due diligence expected of litigants, it would have realized that a federal suit was not warranted by existing law: Buckley's website plainly shows that the Firm has an American partner who is domiciled in the United Kingdom, which eliminates any basis for federal diversity jurisdiction.

Now that this matter has been properly filed in the court that has jurisdiction, where transparent procedural rules apply and discovery is available to both parties, Buckley will finally receive the fair adjudication of its Claim that Oxford promised but never intended to provide, and Buckley will be able to hold Oxford accountable for its unfair and deceptive conduct in violation of North Carolina law.

## THE PARTIES

1.     Plaintiff Buckley is a law firm and limited liability partnership formed in the District of Columbia, with offices in Washington, D.C., Los Angeles, San Francisco, New York, Chicago, and London.

2.     Upon information and belief, Defendant Series 1 of Oxford Insurance Company NC LLC is a limited liability company formed in Delaware and licensed as a special purpose captive insurer by the State of North Carolina. At all times relevant to the allegations in the complaint, Oxford was engaged in the business of writing insurance policies and contracting with captive reinsurers licensed in North Carolina. Its registered agent for service of process is W.Y. Alex Webb, located at 910 North Sandhills Blvd., Aberdeen, North Carolina 28315. Oxford is administered and controlled by employees of non-party ORMG, a limited liability company formed in Delaware with its principal place of business in Maryland. Among other things, ORMG employees negotiate with Oxford's insureds regarding the terms of insurance policies, investigate insurance claims by insureds of Oxford, and make insurance coverage decisions for Oxford.

3.     Upon information and belief, the parties are not diverse for purposes of federal diversity jurisdiction under 28 U.S.C. § 1332(a) because diversity is required with respect to each of Buckley's partners and there is no diversity with respect to a Buckley partner who is an American citizen domiciled in the United Kingdom.

## JURISDICTION, VENUE, AND GOVERNING LAW

4.     This Court has personal jurisdiction over Oxford because Oxford selected and consented to exclusive jurisdiction in North Carolina in its insurance agreement with Buckley, Actual Net Loss Insurance Policy, Policy Number BSL-17-NC (the "Policy"). Ex. A¶ VII.B. Additionally, Oxford has purposely availed itself of the rights and benefits of the laws of the State of North Carolina by engaging in systematic and continuous contacts within the state. For example, Oxford is licensed as a special purpose captive insurer under the laws

6

of the State of North Carolina and executes reinsurance agreements with captive insurance companies formed in North Carolina.

5.     Venue is proper in this Court because the parties agreed to venue in the State of North Carolina. *Id.* ¶ VII.B.  Additionally, venue is proper in Mecklenberg County pursuant to N.C. Gen. Stat. § 1-80 and/or § 1-82.

6.     The parties agreed that all questions regarding their rights and obligations under the Policy and the enforcement and interpretation of the Policy are governed by the laws of the State of North Carolina. *Id.* ¶ IX.F.

FACTUAL ALLEGATIONS

A.     **Buckley's Loss of Key Employee Insurance.**

7.     In 2014, as part of a larger assessment of potential risks facing law firms generally, Buckley implemented a program to insure the Firm against losses associated with the departure of key, revenue-generating partners.  Buckley insured this risk through different insurance companies over the years.

8.     On December 29, 2017, Oxford agreed to issue the Policy to Buckley, and Buckley paid Oxford a $6 million premium.  The Policy was effective from December 30, 2017, through December 30, 2018, although Buckley did not receive a copy of the Policy in final form until June 2018. *See* Ex. A.

9.     The Policy provides coverage to Buckley for numerous "Scheduled Events," subject to a per-claim limit of $6 million and an aggregate limit of $12 million.

10.     In the Policy, Oxford agreed to provide coverage to Buckley for, among other things, a "Loss of Key Employee" event.  Pursuant to paragraph I.GG.38 of the Policy, in the event that a key employee voluntarily terminated his or her employment at Buckley, Oxford

7

agreed to reimburse Buckley for its "Actual Net Loss" in connection with the loss of the key employee, including net income lost as a result of the employee's departure, expenses incurred to avoid or minimize such income loss, and extra miscellaneous expenses.

11.     The purpose of the Loss of Key Employee coverage was to provide prompt compensation to Buckley to offset losses caused by the departure of a key employee, thus reducing the short-term financial impact of those losses. Recognizing that prompt payment of such claims is important, Oxford committed in Section V.D.1 of the Policy that such payments should be made to Buckley, "[w]ithin 30 days of receipt of the completed claim form(s)," if Buckley complied with the Policy (as it did) and the parties agreed on, or a judgment determined, the amount of the payment.

12.     Under the Policy, a key employee is defined to include a person (a) holding any of the officer positions created by the charter, constitution, by-laws, or any other similar governing documents of the Insured, and (b) who is a Chief Executive Officer, Chief Financial Officer, Chief Administrative Officer, Executive Vice President, or equivalent leadership position with the Insured. Buckley's key employees were not identified by name in the Policy, but when applying for the Policy Buckley provided Oxford the names of seven partners, including Andrew L. Sandler, who satisfied the Policy's definition of key employees. Oxford accepted the inclusion of Mr. Sandler on the list of key employees without objection. More than $1.1 million of the $6 million premium Buckley paid was specifically for the Loss of Key Employee coverage.

**B.      Buckley Initiates an Investigation of Mr. Sandler.**

13.     On the afternoon of Friday, December 15, 2017, three members of Buckley's Executive Committee, Benjamin Klubes, John Kromer, and Christopher Witeck (the

8

"Executive Committee")[1] learned of an issue involving potential misconduct by Mr. Sandler. The Executive Committee subsequently learned of additional allegations of potential misconduct by Mr. Sandler related to other individuals. The individuals involved in the alleged incidents requested privacy, confidentiality, and anonymity due, in part, to fear of potential retaliation by Mr. Sandler.

14.     Consistent with Buckley's policies, the Executive Committee treated the matter seriously. The Executive Committee promptly engaged outside counsel to conduct an investigation of Mr. Sandler's conduct while respecting the confidentiality and privacy requested by third parties. On December 21, 2017, Buckley retained Washington, D.C.-based attorney Kathryn Ruemmler, Global Co-Chair of the White Collar Defense and Investigations Practice at Latham & Watkins LLP ("Latham") and former White House Counsel to conduct the investigation.

15.     Although the allegations warranted investigation under the Firm's policies, the Executive Committee did not know *in December 2017* whether any of the allegations would be substantiated, or what type of potential remedial action might be appropriate if any of the allegations were substantiated. Thus, the Executive Committee did not believe in December 2017 that Mr. Sandler might—let alone that it was likely he would—leave the Firm, voluntarily or involuntarily. Nor did the members of the Executive Committee believe in December 2017 that Mr. Sandler would refuse to cooperate with the investigation and then voluntarily resign from the partnership, presumably, at least in part, to avoid the investigation.

---

[1] The fourth member of Buckley's Executive Committee at that time was Mr. Sandler, but references to the Executive Committee in this Complaint refer only to Messrs. Klubes, Kromer, and Witeck.

9

## C.  Mr. Sandler Refuses to Cooperate with the Investigation.

16.    In late January 2018, Mr. Sandler returned to the United States from an extended vacation.  On January 29, 2018, the Executive Committee met with Mr. Sandler, informed him of the investigation, told him that no conclusions had been reached regarding the allegations, and stated that the Firm expected him to cooperate with the investigation, which he initially agreed to do.  At the end of the meeting, the Executive Committee handed Mr. Sandler a letter from Ms. Ruemmler, which stated that no conclusions had been reached as to the validity of the allegations and requested that Mr. Sandler meet with Ms. Ruemmler as soon as possible to discuss the allegations.

17.    The same day, shortly after meeting with the Executive Committee, Mr. Sandler retained counsel:  Mark London of London & Mead in Washington, D.C.

18.    On January 30, 2018, Mr. London spoke to Ms. Ruemmler by telephone.  She requested an interview with Mr. Sandler and explained that he had a fiduciary duty to Buckley to cooperate with the investigation.[2]  Mr. London said he did not believe it was in Mr. Sandler's interests to submit to an interview.  Mr. London raised the possibility of negotiating the terms of Mr. Sandler's resignation from the Firm.  Mr. London asked to meet with Ms. Ruemmler the next day.  She agreed.

19.    At the meeting the next day, Ms. Ruemmler and her partner, Jonathan Su, discussed the investigation with Mr. London, who again said that Mr. Sandler would not

---

[2] This Complaint describes certain non-privileged communications between Ms. Ruemmler and Mr. Su of Latham, on one hand, and Mr. London, on the other.  It does not disclose any privileged communications between the Latham lawyers and Buckley, or any of Latham's legal advice.

10

submit to an interview. Ms. Ruemmler and Mr. Su did not tell Mr. London that Mr. Sandler must resign from the partnership or that the Firm intended to remove him involuntarily.

20.     Later that day, Mr. London met with Mr. Klubes and Mr. Kromer to discuss the matter. Mr. London again said Mr. Sandler would not agree to be interviewed. Mr. Klubes and Mr. Kromer explained that they needed to meet with the Firm's equity partners later that week to inform them of the investigation so they could decide how to proceed in light of Mr. Sandler's refusal to cooperate. During the meeting, Mr. Klubes and Mr. Kromer did not state, suggest, or imply that Mr. Sandler must resign or he would be involuntarily removed from the partnership.

**D.     The Partnership Responds to Mr. Sandler's Refusal to Cooperate.**

21.     On Friday, February 2, 2018, Buckley's equity partners met to discuss the investigation and decide how to proceed in light of Mr. Sandler's refusal to cooperate. After Mr. Sandler addressed the partnership, he left the meeting. The partnership deliberated and then decided by unanimous vote to: (1) continue the investigation; (2) remove Mr. Sandler from his role as Chairman and Executive Partner of the Firm; and (3) place Mr. Sandler on administrative leave, with pay, until the investigation was complete. The last two actions were to be effective as of the next business day, Monday, February 5. The partners did not decide to remove Mr. Sandler from the partnership involuntarily and did not invoke the procedures in Buckley's partnership agreement that would have been necessary to do so.

22.     The Executive Committee called Mr. London after the partnership meeting to inform him of the result of the partnership's unanimous vote. The Executive Committee did not state, suggest, or imply to Mr. London that Mr. Sandler must resign or he would be involuntarily removed from the partnership.

11

### E. Mr. Sandler Resigns Voluntarily.

23.     The next day, February 3, 2018, Mr. London informed Buckley that Mr. Sandler had decided to resign, subject to the execution of a mutually acceptable agreement. Until that day, Buckley did not know that Mr. Sandler would voluntarily resign from the partnership.

24.     On February 5, 2018, the Firm and Mr. Sandler executed a Term Sheet setting forth the terms of his resignation. Mr. Sandler entered into the Term Sheet voluntarily, with advice of counsel, after carefully negotiating the language of the Term Sheet. In the Term Sheet, Mr. Sandler expressed "his intent to voluntarily withdraw and retire as an Equity Partner" effective as of March 20, 2018.

25.     On February 26, 2018, the parties executed a Retirement Agreement that was based on, and which superseded, the Term Sheet. Mr. Sandler entered into the Retirement Agreement voluntarily, with advice of counsel, after carefully negotiating the language of the agreement. In the Retirement Agreement, Mr. Sandler again agreed that he had "withdrawn voluntarily and retired," that he had "execute[d] [the agreement] voluntarily with full knowledge of its significance following discussion with counsel," and that the "releases provided herein are given voluntarily."

### F. Mr. Sandler's Contemporaneous Statements About His Resignation.

26.     Within the days, weeks, and months following the announcement of his retirement, Mr. Sandler repeatedly made statements to hundreds of people—including attorneys and staff at Buckley, clients, others in the financial services industry, and members of the press—in which he characterized his retirement as voluntary.

27.     On February 6, 2018, Mr. Sandler met with all of the Firm's Washington, D.C.-based partners to announce his voluntary retirement. Mr. Sandler explained that he was retiring to pursue his other business and personal interests and otherwise characterized his resignation as voluntary.

28.     On the morning of February 7, 2018, Mr. Sandler sent an email informing the entire Firm of his decision to resign and making clear that it was a voluntary decision:

> Dear Colleagues:
>
> I have just returned from a wonderful family trip. While enjoying my time abroad, I have reached the conclusion that it has become too difficult to continue to juggle my role as Chairman and Executive Partner of Buckley Sandler with my responsibilities leading Treliant Risk Advisors, Temerity Capital and Asurity Technologies and still have time to pursue my personal interests.
>
> In recent months, I have been transitioning my client relationships to others at the Firm and have reduced my leadership responsibilities as well. On Monday, I advised the Executive Committee that I am resigning as Chairman and Executive Partner of the Firm and that I am retiring from the Firm, effective March 20th, which is the 9th anniversary of the formation of Buckley Sandler.
>
> I want to thank all of you who have worked with me to build this amazing law firm and to let you know that it has been my distinct pleasure to have had the opportunity to lead the Firm since its inception in March 2009. I am proud of what we have built together at Buckley Sandler and confident that the Firm will continue to achieve great success in the future.
>
> I wish you all the best.

29.     On the morning of February 7, 2018, Mr. Sandler was interviewed by a reporter for the *American Lawyer*, which published an article later that day making clear that, during the interview, Mr. Sandler had characterized his retirement as voluntary.

13

30.     At noon on February 7, 2018, Mr. Sandler met with all Buckley attorneys in the Firm's Washington, D.C. office and explained that he was retiring voluntarily to pursue other business and personal interests.

31.     At 1:00 p.m. on February 7, 2018, Mr. Sandler met with all non-attorney employees in the Firm's Washington, D.C. office and explained that he was retiring voluntarily to pursue other business and personal interests.

32.     On March 13, 2018, Mr. Sandler made a presentation to the *Consumer Banking Association Live* conference during which he discussed his retirement and characterized it as voluntary.

33.     On March 19, 2018, Mr. Sandler sent an email to the entire Firm with the subject line, "Off to New Adventures," in which he again characterized his retirement as voluntary: "I am very certain that this is the right time for me to climb other mountains . . . . I thank all of you for enabling me to start a new professional and personal chapter without worry about whether Buckley Sandler will flourish in my absence."

34.     On March 19, 2018, during the Firm's annual *Fair Lending Today* conference, Mr. Sandler spoke to many Firm clients and other participants in the financial services industry about his retirement and characterized it as voluntary.

**G.      Oxford Tells Buckley Not to Submit a Loss of Key Employee Claim.**

35.     Unsurprisingly, as a result of Mr. Sandler's departure, Buckley suffered a reduction in revenue and concomitant loss of net income. As a founding partner, a highly successful attorney, and substantial business developer, Mr. Sandler had generated substantial revenue for Buckley every year since the Firm's founding in 2009.

14

36.     On or about March 6, 2018, Buckley's insurance counsel notified ORMG's general counsel, Susan Euteneuer, of Buckley's intent to file a notice of claim under the Policy for the loss of a key employee, Mr. Sandler (the "Claim").  Although she apparently had no prior knowledge of the circumstances of Mr. Sandler's resignation, Ms. Euteneuer said Buckley should not bother to submit a notice of the potential Claim because Oxford would deny it on the ground that Buckley must have known of Mr. Sandler's intention to resign from the Firm before the Policy was effective on December 30, 2017.

37.     On March 7, 2018, Buckley sent Oxford written notice of Buckley's Claim, as required by the Policy.

**H.     Oxford Attempts to Negate Buckley's Coverage with Endorsement 2.**

38.     On June 13, 2018, Oxford sent Buckley a final copy of the Policy, which Buckley had not previously received from Oxford.  In the final documents, Oxford had added a single-page "Endorsement 2" to the Policy that purported to negate Loss of Key Employee coverage for Mr. Sandler and five other partners whom Buckley had disclosed to Oxford as key employees.  Ex. B, Endorsement 2.  Oxford did this despite knowing that Buckley: (a) had already paid a $1.1 million premium to cover, among others, Mr. Sandler, as a key employee; and (b) had already provided Oxford notice of its Claim based upon Mr. Sandler's departure.  Oxford added Endorsement 2 to the Policy without telling Buckley or obtaining Buckley's agreement.  Buckley never would have agreed, and never did agree, to Endorsement 2 because it would have effectively vitiated the Loss of Key Employee coverage for which Buckley had paid $1.1 million.

39.     Later, Buckley learned that Oxford had previously included Endorsement 2 as an attachment to an email sent on March 13, 2018 (a week after Buckley notified Oxford of

its Claim) to Buckley's outside insurance counsel, but Oxford camouflaged its unilateral insertion of Endorsement 2 by not highlighting in its cover email that Endorsement 2 was one of several attachments to the email. The cover email did not disclose that Oxford was adding Endorsement 2 to the Policy, explain why Oxford was doing so, or seek Buckley's consent to the change. As a result, Endorsement 2 did not come to the attention of Buckley until the summer of 2018 when Buckley was preparing its Claim submission.

40.     Promptly upon learning of Oxford's surreptitious effort to add Endorsement 2 to the Policy without Buckley's consent, Buckley informed Oxford that the Firm had not agreed to Endorsement 2 and would not accept it as part of the Policy. Caught red-handed, and unable to explain any legitimate reason for adding Endorsement 2, Oxford agreed in writing that Endorsement 2 was not in effect or a part of the Policy. Buckley thought that put an end to the matter, but it was wrong.[3]

## I.     Oxford Enters Into a Nondisclosure Agreement with Buckley.

41.     On August 31, 2018, Mr. Klubes, Mr. Witeck, and the Firm's outside counsel for insurance matters traveled to Annapolis, Maryland to meet with Mr. DiMayo. They discussed Buckley's Claim and Mr. DiMayo's questions about it. Specifically, Oxford wanted assurances that (a) Mr. Sandler had not been planning to resign from the Firm before the December 30, 2017 effective date of the Policy, and (b) Mr. Sandler would not receive any of the insurance proceeds if Oxford paid Buckley's Claim.

---

[3] Incredibly, in 2019, a year later, Oxford again attempted to eliminate Buckley's Loss of Key Employee coverage by slipping another "Endorsement 2" into Buckley's insurance policy for 2019 without notice and without Buckley's agreement. *See* Section Q, below.

16

42.     To address Oxford's questions, Buckley planned to disclose certain information to Oxford regarding the investigation of Mr. Sandler and the losses to the Firm caused by his voluntary departure. Buckley and Oxford entered into the Nondisclosure Agreement covering this information because individuals who had raised concerns about Mr. Sandler had requested privacy, confidentiality, and anonymity due, in part, to fear of potential retaliation by Mr. Sandler, and some of the information was commercially sensitive financial information. The Nondisclosure Agreement prohibited Oxford from disclosing information about Buckley's Claim—including "that discussions are taking place between the Parties regarding the Claim"—to anyone other than specified Oxford personnel or related parties "who have a clear need to know for purposes of processing, evaluating, and effecting payment on the Claim." Ex. C at 2. Oxford agreed further that any disclosure of Buckley's confidential information regarding the Claim would cause "irreparable injury to Buckley," that Buckley would be entitled to injunctive or other equitable relief to remedy any violations, that the contract would be governed by North Carolina law, and that any suit or action to enforce the Nondisclosure Agreement "may be brought only in courts located within the State of North Carolina" which "will have venue and subject matter and personal jurisdiction . . . ." Ex. C at 3. The Nondisclosure Agreement does not permit Oxford to use any of Buckley's confidential information to file a lawsuit against Buckley.

**J.      Mr. Sandler Allegedly Tells Oxford that His Resignation Was Involuntary.**

43.     According to a complaint filed by Oxford on October 9, 2019, in the United States District Court for the Western District of North Carolina, Mr. Sandler informed Oxford on or about October 1, 2018, that his departure from the Firm was involuntary. While Buckley disputes the accuracy of Mr. Sandler's statement, Oxford was on notice of it

17

in early October 2018 and was able to consider it as Oxford made further decisions about Buckley's Claim, including its decision to approve the Claim, in writing, on October 26, 2018.

44.    Mr. Sandler's statement to Oxford that his resignation was involuntary is baseless as a matter of fact and law. Buckley never terminated Mr. Sandler or forced him to resign. Even after he had refused to cooperate with the investigation, the partnership did not invoke the procedures in its partnership agreement for an involuntary withdrawal from the partnership. Instead, the partnership voted to continue the investigation, remove Mr. Sandler as Chairman and Executive Partner, and place him on administrative leave with pay until the investigation was complete, allowing him to remain a partner. As detailed above, Mr. Sandler himself made numerous statements at, and after, the time of his resignation characterizing it as voluntary, including in binding legal agreements that he and his lawyer carefully drafted.

45.    Mr. Sandler had an economic incentive to make the statement Oxford attributes to him and thereby undermine Buckley's Claim because he had formed a captive reinsurance company that served as one of hundreds of reinsurers for Oxford with respect to risks insured by the Policy. That captive company will be obligated to pay a portion of the Claim. Mr. Sandler, however, who was no longer at partner at Buckley, would receive none of the benefits of the insurance proceeds.

46.    Mr. Sandler sought not only to avoid his captive paying a portion of the Claim, but also to receive direct payment of a portion of the Claim proceeds in exchange for not telling Oxford that his departure was involuntary. In conversations regarding the Claim with Mr. Klubes and Mr. Witeck on October 1 and 5, 2018, Mr. Sandler stated for the first

time that his departure may have been involuntary. He stated that this could either be a "win-win" or a "lose-lose" situation for him and Buckley depending on what he told Oxford about the voluntariness of his departure. He proposed an agreement with Buckley under which the Firm would pay him a portion of the insurance proceeds and he would not tell Oxford that his departure was involuntary. Buckley rejected Mr. Sandler's proposal and repeatedly told Mr. Sandler that he was free to speak to Oxford as he saw fit.

47.     On February 3, 2019, in a call to Mr. Witeck, Mr. Sandler made a similar proposal: he would make statements to Oxford supporting Buckley's insurance claim, including by providing information about the amount of loss, in exchange for the Firm's agreement that it would use some of the insurance proceeds to make payments that Mr. Sandler believed he was entitled to as a retiring partner. If the Firm did not agree, Mr. Sandler threatened to call Mr. DiMayo and make statements undermining Buckley's Claim. Mr. Sandler again told Mr. Witeck that he could make it a "win-win" or a "lose-lose" situation for Buckley and himself. Consistent with Buckley's response to Mr. Sandler in October 2018, Mr. Witeck again rejected Mr. Sandler's proposal and told him he should communicate with Oxford as he saw fit.

48.     In light of Mr. Sandler's communications with Buckley discussed above, it was unreasonable for Oxford to rely upon Mr. Sandler's statement that his departure was involuntary.

49.     Regardless of Mr. Sandler's purported subjective belief that his departure was involuntary, applicable North Carolina law is clear that a person who resigns to avoid having to participate in an employer's investigation of his or her conduct has resigned voluntarily.

**K.    Oxford Approves Coverage for Buckley's Claim.**

50.    On October 17, 2018, Mr. Witeck and Mr. Klubes again met with Mr. DiMayo to discuss the Claim.  Among other things, they provided detailed factual responses to the questions Mr. DiMayo had raised at their last meeting.  They assured him that Mr. Sandler had not been planning to resign from the Firm before the December 30, 2017 effective date of the Policy and that Mr. Sandler would not receive any proceeds from the Claim.  They also explained to him that the investigation of Mr. Sandler began in December 2017, before the effective date of the Policy.  During the meeting, Mr. DiMayo did not inform Mr. Klubes or Mr. Witeck of Mr. Sandler's October 1, 2018 statement to Oxford that his departure from the Firm was involuntary.

51.    On October 19, 2018, the Firm submitted its Claim Filing Form to Oxford, with supporting materials.

52.    On October 26, 2018, Mr. DiMayo informed Buckley by email that Oxford had approved coverage.  In his email, Mr. DiMayo stated that Oxford:  (1) "had reviewed the claim in detail after you left the office for our last meeting," (2) had "concluded that afternoon that we would cover the claim," and (3) was "prepared to work with you to determine the amount of loss."  Ex. D, October 26, 2018 email from M. DiMayo to C. Witeck.  Mr. DiMayo said Oxford "had relayed this information to [Buckley's insurance counsel] and asked him to please let you know the good news."  Ex. D.  Mr. DiMayo approved coverage without referring the Claim to a third party for assessment.  When he approved coverage, Mr. DiMayo knew that: (a) Mr. Sandler told Oxford on October 1, 2018, that his departure from the Firm was involuntary, and (b) the Executive Committee had

learned of the initial concerns regarding Mr. Sandler's conduct in mid-December 2017, prior to the Policy's effective date.

**L.    Buckley Calculates its Net Loss and Requests Payment of $6 Million.**

53.    In reliance on Oxford's written notice that it would provide coverage, Buckley expended additional, substantial time and effort to calculate its net loss in connection with Mr. Sandler's resignation. Buckley informed Mr. DiMayo that the Firm would like to obtain payment of the Claim by December 31, 2018. That way, the insurance proceeds would offset the losses from Mr. Sandler's resignation when the Firm closed its books for 2018. Mr. DiMayo said Oxford should be able to pay the Claim by the end of the year if Buckley promptly submitted a calculation of its net loss and supporting financial data.

54.    To ensure that its methodology for calculating the loss was sound, Buckley retained Professor Robert Hirshon of the University of Michigan Law School. Professor Hirshon is a former president of the American Bar Association and a distinguished attorney with years of experience in leadership positions at different law firms. Mr. Hirshon analyzed financial data from Buckley and approved two methods for calculating the loss of net profit suffered by the Firm in connection with Mr. Sandler's resignation, both based on Mr. Sandler's historic business generation for the Firm. The two methods were highly conservative but under either method it was clear that Buckley's losses resulting from Mr. Sandler's departure exceeded the Policy's $6 million per claim limit. Further, because Mr. Sandler was no longer at the Firm, it was not necessary or helpful to wait until the conclusion of the period of restoration to ascertain Buckley's losses. On November 2, 2018, Buckley submitted its net loss calculation to Oxford and requested payment of $6 million, the maximum amount of coverage under the Policy.

55.     Throughout November and December of 2018, Oxford asked follow-up questions and requested additional financial data relating to the net loss calculation. Buckley again expended substantial time and effort to promptly answer Oxford's questions and provide additional data, with the continuing expectation that Oxford would pay the Claim by the end of the year. During this process, Oxford did not propose a different way to calculate the net loss and did not challenge or disagree with any aspect of Buckley's methodology for calculating the net loss that entitled Buckley to the full $6 million Claim.

## M.     Oxford Reverses Its Decision to Provide Coverage and Refers the Claim to a Third Party.

56.     On December 27, 2018, Mr. Klubes and Mr. Witeck spoke with Mr. DiMayo to check on whether Oxford had completed its work on the net loss calculation and determine when Oxford would make payment. Rather than discussing the amount of the loss, Mr. DiMayo threatened to deny or delay the payment of the Claim unless Buckley settled for a fraction of its losses. Though Oxford had already approved coverage months earlier and the only question remaining was the amount of Buckley's loss, Mr. DiMayo claimed that Oxford now had documents suggesting that Mr. Sandler's business had been falling off and Buckley had forced Mr. Sandler to leave the Firm. Mr. DiMayo would not specify what the documents were or how Oxford had obtained them. Nor did Mr. DiMayo disclose Mr. Sandler's October 1, 2018 statement to Oxford that his resignation was involuntary. Mr. DiMayo said if Buckley did not accept a settlement between $500,000 and $1,000,000 he might have to refer the Claim to a third party for assessment, in which case he would lose control of the determination on the Claim. Mr. DiMayo thus made clear that he had discretion to refer the Claim to a third party. When Buckley asked how Oxford had

calculated that the Firm's loss was between $500,000 and $1,000,000, Mr. DiMayo said

Buckley should contact Kristan Costello, Chief Financial Officer of ORMG, who was

responsible for Oxford's valuation of Buckley's Claim.

57.     Following Mr. DiMayo's instructions, Buckley contacted Ms. Costello the

next day, Friday, December 28, 2018, and attempted to schedule a phone call with her.  She

responded by email that day and said she would speak with them early the following week.

On Thursday, January 3, having heard nothing from Ms. Costello, Buckley emailed again to

ask when she would be available to talk.  She never responded.

58.     Later that day, Buckley received a letter dated January 3, 2019, from The Taft

Companies LLC ("Taft"), Oxford's agent, stating that an "independent" firm would

determine the validity of the Claim and the extent of any loss.  Contrary to Mr. DiMayo's

statement suggesting he had discretion to refer the matter to a third party, the letter stated that

a that "all claims in which losses may exceed $100,000 are subject to enhanced third party

review."  Oxford waited to notify Buckley that the Claim would be reviewed by a third party

until January 3, 2019, just two business days after Buckley had paid Oxford the premium to

renew its insurance coverage for 2019.

59.     On January 7, 2019, Mr. Witeck and Mr. Klubes sent an email asking

Mr. DiMayo, among other things, why Oxford had suddenly referred the matter to a third

party.  They asked him to provide copies of any documents supporting his allegation that

Buckley had forced Mr. Sandler out of the Firm, as they wanted an opportunity to respond to

such documents.  They also informed Mr. DiMayo that, as he had suggested, they had

requested a call with Ms. Costello several times to discuss her financial analysis of Buckley's

actual net loss calculation, but she had not responded.  Buckley asked Mr. DiMayo to provide

Buckley a copy of any financial analysis of the net loss done by Ms. Costello and any preliminary conclusions she had reached.

60.    On January 10, 2019, Mr. DiMayo responded by email and stated "every insurance claim we receive goes through both inside and independent comprehensive review." That statement was inconsistent with his approval of the Claim without third party review on October 26, 2018. He did not provide any documents or specific information supporting his allegation that Buckley had forced Mr. Sandler out of the Firm. Instead, he responded vaguely that Oxford had information that "appears to be contradictory." He also did not provide any financial analysis by Oxford. He said only that there were questions about the amount of the loss. Without explaining why Oxford should pay less than the full $6 million claim limit, he offered to pay Buckley a small fraction of that amount. Buckley rejected his offer.

**N.    Oxford Fails to Take Any Action on Buckley's Claim for Months.**

61.    For the next six weeks, Buckley heard nothing from Oxford. Finally, on February 20, 2019, Taft, on behalf of Oxford, notified Buckley that it was "finalizing an engagement with the independent firm within the next week." Thus, months after Buckley had submitted a valid claim (which Oxford approved), provided supporting data for its loss, answered all of Oxford's numerous follow-up questions and requests for additional information, and demonstrated that its losses were in excess of $6 million, Oxford was still in the process of hiring a third party to assess the Claim, and had made no progress in deciding whether it would pay the Claim or how much it would pay.

62.    Buckley waited for another five weeks with no word from Oxford and no progress regarding the investigation or payment of Buckley's Claim. Confronted with clear

evidence that Oxford intended to unreasonably delay any decision about the Claim, Buckley's outside counsel wrote a letter to Oxford on March 29, 2019, explaining that if its Claim were not paid it would have no choice but to file a lawsuit, and enclosing a draft complaint against Oxford alleging, among other things, breach of contract, tortious refusal to settle an insurance claim, and unfair and deceptive trade practices under North Carolina law.

63.     The next business day, April 1, 2019—five months after Oxford approved coverage and three months after Oxford announced that it was referring the Claim to a third party—Thomas Ricci, a claims adjuster at Curley, contacted Buckley's outside counsel to make arrangements for an investigation of Buckley's Claim, including by scheduling interviews with Buckley attorneys.

**O.     Oxford Gives Conflicting Explanations for Referring the Claim to a Third Party, Refuses to Disclose its Claim Procedures, and Refuses to Disclose the Alleged "Inconsistencies" in Buckley's Claim.**

64.     Despite the months of unexplained delays, in resolving its Claim, Buckley sent a letter to Mr. Ricci agreeing to cooperate with Curley's investigation.  In its letter to Mr. Ricci, Buckley asked him to identify the Buckley attorneys he wanted to interview, and asked him to explain the factual basis for Oxford's reversal of its decision to provide coverage so that the Buckley witnesses could be prepared to address that issue during their interviews.

65.     Mr. Ricci did not respond.  Instead, on April 12, 2019, Womble, litigation counsel recently retained by Oxford, not the independent claims adjuster, responded that "ORMG's claims procedure provides that in the event that Taft, after review with ORMG's general counsel, is unable to form an opinion clearly and without reservation as to whether there is coverage or no coverage on a particular claim, the claim is to be referred to a third

party for evaluation." This explanation for the referral to a third party differed from Oxford's previous statements that "every" claim was referred to a third party, and that "all claims in which losses may exceed $100,000 are subject to enhanced third party review."

66.     Oxford's counsel also said Oxford's decision to refer the Claim to a third party was "in large part due to inconsistencies between statements made by representatives of Buckley Sandler and the documentation provided by Buckley Sandler. These inconsistencies have called into question whether Mr. Sandler's departure was truly voluntary and the extent to which the departure resulted in lost clients and revenue for Buckley Sandler." Oxford's counsel did not specify what the "inconsistencies" were and did not disclose that Mr. Sandler had told Oxford on or about October 1, 2018, that his resignation was involuntary.

67.     Confronted by shifting explanations for Oxford's decision to refer the Claim to a third party, Buckley requested in letters dated April 18, April 26, and May 30, 2019, that Oxford produce "ORMG's claims procedure," which Oxford said it had relied upon in referring the Claim to a third party. Oxford refused. Instead, it produced an "Executive Reference Manual" regarding Oxford's captive insurance program, which provides that "[f]or some complex claims, we may engage additional consultants to assist in the investigation and analysis." This statement was inconsistent with Oxford's prior statements to Buckley that Oxford referred "every" claim to a third party, and that all claims in excess of $100,000 were referred to a third party.

68.     Buckley also requested in letters dated April 18, April 26, and May 30, 2019, that Oxford explain the "inconsistencies" that "called into question whether Mr. Sandler's departure was truly voluntary" and supposedly caused Oxford to refer the matter to at third party. Buckley wanted to know what the inconsistencies were so it would be able to address

them. Oxford did not to disclose that Mr. Sandler had notified Oxford on October 1, 2018, that his departure was involuntary. Nor was Oxford able to identify any other "inconsistencies" of which it was aware on January 3, 2019, when it announced that it was referring the Claim to a third party. As a result, Buckley still does not know what caused Oxford to reverse its initial decision to provide coverage and refer the matter to a third party for an additional nine months of investigation.

**P.** **Oxford Misleads Buckley Regarding Curley's Independence and Fails to Provide Buckley with Any Reasoned Decision on Coverage.**

69.     Oxford repeatedly assured Buckley that Curley would conduct an independent investigation. In a January 3, 2019 letter, Oxford's agent, Taft, referred to Curley as an "independent firm." In a January 10, 2019 email, Oxford told Buckley that the Claim would go through an "independent comprehensive review." In a February 20, 2019 email, Taft again referred to Curley as an "independent firm." In an April 12, 2019 letter, Womble called Curley an "independent adjusting organization" that was "not affiliated with ORMG or Series 1" and is "not represented by our firm." Womble added that Oxford "looks forward to receiving the results of [Curley's] investigation and processing the claim accordingly," suggesting that Curley would determine the result and then notify Oxford of the outcome. In an April 22, 2019 letter, Womble stated that Curley was a "third party independent investigator" that was engaged in "an unbiased review" of the Claim and was "entitled to conduct its investigation without impediments presented by third parties . . . ." In a June 13, 2019 letter, Oxford's counsel stated that engaging a "Third Party Adjuster" to review the Claim "ensures objectivity and independence."

27

70.     Relying on those assurances of Curley's independence, Buckley waited for nine months, from January 2019 through September 2019, for Curley to complete its supposedly "independent" and "unbiased" investigation. Buckley also expended substantial resources complying with Curley's and Oxford's demands for documents, information, and interviews, with the understanding that Curley would evaluate the evidence critically and assess the Claim fairly, subject to the Nondisclosure Agreement.

71.     Despite all of Oxford's assurances, Curley did not carry out an independent investigation or an unbiased assessment of the evidence. The investigation conducted by Mr. Ricci appeared remarkably similar to one-sided civil discovery, in which Mr. Ricci and Womble posed interrogatories, made requests for production of documents, and demanded interviews under oath of more than a dozen current and former Buckley lawyers. Suspicious that Oxford's counsel had, in fact, orchestrated this investigation to give Oxford an unfair advantage in any subsequent litigation, Buckley again requested the claims procedures to determine if such investigatory steps were authorized. Oxford refused to produce them.

72.     Oxford's counsel answered questions that Buckley directed to Curley even though Oxford's counsel did not represent Curley. As part of Curley's investigation, it conducted interviews in which it asked one-sided questions to undermine Buckley's Claim, without making any effort to explore facts or develop evidence that might support the Claim. For example, when interviewing Mr. Sandler, Curley did not confront him with any of his numerous prior statements about the voluntariness of his resignation; Curley merely accepted without question Mr. Sandler's uncorroborated statement that he had resigned involuntarily. Curley's uncritical acceptance of Mr. Sandler's statements during his interview is all the more remarkable given that Mr. Sandler failed to disclose to Curley the most important

28

development during Buckley's investigation: Mr. Sandler's refusal to cooperate. Curley also credited Mr. Sandler's testimony despite knowing that Mr. Sandler had offered to make statements helpful to Buckley's Claim if the Firm would pay him some of the insurance proceeds. Underscoring Curley's lack of independence, Oxford's counsel, in an inadvertent revelation of the actual relationship between Curley and Oxford, stated in an email on September 27, 2019, that "*Oxford* continues to work diligently to analyze and process claim 2017-NC-014," even though it was *Curley*, not *Oxford*, who was supposed to analyze and process the Claim. Rather than conducting a truly independent investigation, Curley conducted a sham "independent investigation" designed to develop a basis to achieve the predetermined goal of denying Buckley's Claim.

73.     The predetermined result of Curley's investigation was also evident in its failure to respond in any way to a lengthy presentation from Buckley on September 20, 2019, summarizing the facts and applicable law that supported its Claim. At the end of the investigation, Buckley submitted to Curley a detailed, written analysis of the overwhelming factual evidence that supported Buckley's Claim. This evidence included: (a) roughly a dozen contemporary statements, both oral and written, from Mr. Sandler himself characterizing his resignation as voluntary; (b) the complete absence of even a single document at or near the time of Mr. Sandler's resignation corroborating his claim that his resignation was involuntary; and (c) sworn statements from three Buckley attorneys and two Latham attorneys that the Firm had not told Mr. Sandler that he must resign and had taken no steps to remove him from the partnership (even after he refused to cooperate with the investigation in violation of his fiduciary duty).

29

74.     Buckley also provided Curley a legal analysis, supported by an expert legal opinion from Mitchell Dolin of Covington & Burling LLP showing that, under the applicable North Carolina law, a resignation for the purpose of avoiding being subjected to an investigation of potential misconduct is still a voluntary resignation. This is true even if the employee subjectively believes that he or she was forced to resign. Investigations of misconduct are a condition of employment common to all employees, not an intolerable working condition that would render a resignation involuntary.

75.     At the end of its factual and legal presentation to Curley, Buckley offered to answer any other questions Curley might have, asked for the opportunity as a matter of due process to address any other basis Curley might have for denying Buckley's Claim, and requested that Curley provide a reasoned explanation of its decision in writing. While Buckley awaited an independent decision by Curley, Oxford falsely assured Buckley that it would receive a claim determination, stating less than two weeks before filing its lawsuit that Oxford's "sole desire is to make a fair claim determination," that it was working to "analyze and process" the Claim, and that it would "provide you with updates."

76.     Curley never responded in any way to Buckley's presentation. Oxford never informed Buckley of any claim determination, and Oxford did not provide any updates. By reading a complaint filed by Oxford against Buckley, Buckley learned that Curley had apparently completed its "independent" investigation and had informed Oxford, but not Buckley, of the result. Among other things, Curley failed to notify the Firm that the investigation had concluded, failed to disclose what conclusions, if any, Curley had reached, did not explain how the factual evidence was insufficient to support Buckley's Claim, did not

explain how Curley's conclusions were consistent with applicable North Carolina law, and did not provide a reasoned decision of any kind.

**Q. Oxford Attempts to Negate Buckley's 2019 Key Employee Coverage with Another Endorsement 2.**

77. In 2019, a year after Buckley first caught Oxford trying to alter the terms of the 2018 Policy by adding "Endorsement 2," Oxford again attempted to eliminate Buckley's Loss of Key Employee coverage by slipping another "Endorsement 2" into Buckley's insurance policy for 2019 (the "2019 Policy") without notice and without Buckley's agreement.

78. The 2019 Policy provides coverage to Buckley for, among other things, the loss of a key employee, subject to a per-claim limit of $2.5 million. Buckley paid Oxford a $595,200 premium for this coverage. In light of Oxford's attempt to add Endorsement 2 to the Policy in June 2018, Buckley was careful to confirm with Oxford in writing exactly which partners would be considered "key employees" for purposes of Loss of Key Employee coverage under the 2019 Policy. The parties reached an agreement in December 2018 as to which employees would be covered.

79. But, as it had done before, Oxford sent Buckley on June 12, 2019, a "final form" of the 2019 Policy that once again included an "Endorsement 2" (the "2019 Endorsement 2"). The 2019 Endorsement 2 purported to exclude from coverage four of the six partners that Oxford had agreed, in writing, to cover. Oxford also added a provision in the 2019 Endorsement 2—without Buckley's knowledge or consent—purporting to exclude coverage for "any Actual Net Loss related to or caused directly or indirectly by . . . the voluntary retirement of any owner of an Insured."

31

80.     Astonished by Oxford's deceptive and brazen conduct, Buckley wrote a letter to Oxford on September 26, 2019, rejecting the 2019 Endorsement 2 and asking Oxford to confirm that Endorsement 2 was not part of the 2019 Policy. Oxford did not provide such confirmation and did not provide any explanation for its misconduct.

**R.     Oxford Violates the Nondisclosure Agreement by Filing a Lawsuit Using Buckley's Confidential Information.**

81.     Throughout its dealings with Oxford, Womble, and Curley, Buckley repeatedly reminded them that documents produced by Buckley, interviews given by Buckley witnesses, correspondence from Buckley, and other information provided by Buckley to support its Claim were protected from disclosure by the Nondisclosure Agreement, which was intended to protect both the Firm and third parties who had requested privacy, confidentiality, and anonymity due, in part, to fear of potential retaliation by Mr. Sandler. Oxford and Curley never once objected to Buckley's statements. Instead, they continued to make requests for additional information from Buckley, knowing that Buckley believed they would keep it confidential.

82.     On October 9, 2019, however, while Buckley was still waiting for a response from Curley regarding the outcome of its investigation, Oxford filed a lawsuit against Buckley in the United States District Court for the Western District of North Carolina without prior notice to Buckley. It seeks a declaration that Oxford has no obligation to pay Buckley's insurance Claim. Rather than disclosing Buckley's confidential information only to Oxford personnel "who have a clear need to know for purposes of processing, evaluating, and effective payment on the Claim," as the Nondisclosure Agreement required, Oxford disclosed the information in a public lawsuit.

32

83. In its haste to sue its insured and secure a perceived procedural advantage, Oxford failed to conduct the most cursory due diligence, which would have revealed that Buckley has a London office run by a partner who is a U.S. citizen domiciled in the United Kingdom. This destroys diversity of citizenship. Thus, the federal court lacks jurisdiction to hear Oxford's preemptive lawsuit.

84. Despite its lawsuit, Oxford has never notified Buckley of any decision to affirm or deny coverage (with the exception of Oxford's later-recanted affirmance of coverage on October 26, 2018). Oxford's lawsuit neither affirms nor denies coverage; rather, it asks the federal court to determine coverage. Oxford has thus failed to comply with North Carolina law, which requires an insurer "to promptly provide a reasonable explanation of the basis in the insurance policy in relation to the facts or applicable law for denial of the Claim." N.C. Gen. Stat. § 58-63-15(11)(n).

## FIRST CAUSE OF ACTION
### Breach of Contract

85. Buckley repeats and realleges each and every allegation set forth above, and incorporates them herein by reference.

86. The Policy is a valid contract between Buckley and Oxford.

87. Endorsement 2 is not part of the Policy.

88. In addition to the Policy's express terms, the Policy by law contains all terms that are necessarily implied to effect the intention of the parties and which are not in conflict with the express terms.

89.     The Policy requires Oxford, among other things, to analyze Buckley's Claim, to render a decision regarding the amount of the payment that Buckley is entitled to under the Policy for its Claim, and to pay such amount with respect to Buckley's Claim.

90.     Buckley has performed all of its obligations under the Policy.

91.     Oxford, on the other hand, has breached its obligations under the Policy by, among other things, stating it would deny the Claim before even conducting any investigation, attempting to illegally preclude such coverage by including Endorsement 2 in Buckley's final policy without Buckley's agreement, approving coverage and then revoking it without explanation, failing to explain adequately why Buckley's Claim was referred to a third-party investigator, repeatedly delaying rendering a decision regarding the amount of the payment that Buckley is entitled to receive for its Claim, failing to notify Buckley of any decision to affirm or deny coverage, failing to provide a reasoned basis for such decision, and failing to make payment to Buckley for its Claim.

92.     As a direct and proximate result of Oxford's actions, Buckley has sustained damages in excess of $1,000,000.

## SECOND CAUSE OF ACTION
### Breach of Contract

93.     Buckley repeats and realleges each and every allegation set forth above, and incorporates them herein by reference.

94.     The September 28, 2018 Nondisclosure Agreement is a valid contract between Buckley and Oxford.

34

95.     In addition to the Nondisclosure Agreement's express terms, by law it contains all terms that are necessarily implied to effect the intention of the parties and which are not in conflict with the express terms.

96.     The Nondisclosure Agreement required Oxford, among other things, to maintain the confidentiality of all information provided by Buckley relating to the Claim. The Nondisclosure Agreement prohibited Oxford from disclosing Buckley's confidential information to anyone other than specified Oxford personnel or related parties "who have a clear need to know for purposes of processing, evaluating, and effective payment on the Claim."

97.     Buckley has performed all of its obligations under the Nondisclosure Agreement.

98.     Oxford, on the other hand, has breached its obligations under the Nondisclosure Agreement by, among other things, filing a complaint replete with Buckley's confidential information in the United States District Court for the Western District of North Carolina.  Oxford gave no notice to Buckley before filing the complaint.  By filing the complaint, Oxford disclosed to the public Buckley's confidential information, which was further disseminated by news articles online and by social media.

99.     As a direct and proximate result of Oxford's actions, Buckley has sustained irreparable injury and damages in excess of $25,000.

## THIRD CAUSE OF ACTION
### Declaratory Judgment

100.    Buckley repeats and realleges each and every allegation set forth above, and incorporates them herein by reference.

101.    N.C. Gen. Stat. § 1-253 *et seq.* allows this Court to declare the rights, status, and other legal relations of parties, which declaration shall have the force and effect of a final judgment or decree.

102.    An actual controversy of a justiciable nature currently exists between Buckley, on the one hand, and Oxford, on the other hand, concerning the scope of coverage afforded under the Policy and the obligations of the parties with respect to Buckley's Claim asserted under the Policy.

103.    In particular, pursuant to N.C. Gen. Stat. § 1-253 *et seq.*, Buckley is entitled to a judgment declaring:

    a.    The Policy is a valid insurance policy entitling Buckley to coverage;

    b.    Endorsement 2 is not part of the Policy;

    c.    Buckley fully performed all of its obligations and complied with all of the terms of the Policy;

    d.    Buckley has established that its losses as a result of Mr. Sandler's departure are in excess of $6 million;

    e.    Oxford has breached its obligations under the Policy by failing or refusing to pay Buckley's Claim in the amount of $6 million; and

    f.    Buckley is entitled to payment from Oxford on its Claim in the amount of $6 million.

36

## FOURTH CAUSE OF ACTION
### Unfair and Deceptive Trade Practices in Violation of
### N.C. Gen. Stat. § 58-63-15 and § 75-1.1

104.    Buckley repeats and realleges each and every allegation set forth above, and

incorporates them herein by reference.

105.    As alleged in the paragraphs above, Oxford violated the North Carolina Unfair

and Deceptive Trade Practice Act, N.C. Gen. Stat. § 75-1.1 *et seq.* through, among other

things, multiple violations of the North Carolina Unfair Claims Settlement Practices Act,

N.C. Gen. Stat. § 58-63-15(11).

    a.  Oxford violated § 58-63-15(11)(a) and Chapter 75 by

       "[m]isrepresenting pertinent facts or insurance policy provisions

       relating to the coverage at issue."  Specifically:

        i.  Oxford misrepresented that it had approved coverage of

          Buckley's Claim on October 26, 2018 when, in fact, Oxford

          did not approve coverage and filed a lawsuit disputing

          coverage on October 9, 2019.

        ii.  Oxford misrepresented in Endorsement 2 that Mr. Sandler was

          not a key employee for purposes of the Policy's Loss of Key

          Employee coverage.

        iii.  Oxford misrepresented the circumstances under which it refers

          claims to third parties for investigation.  First, Oxford said it

          would refer the Claim to a third party if Buckley would not

          accept payment of a fraction of its Claim.  Then Oxford said all

          claims in excess of $100,000 were referred to a third party.

37

Then Oxford said "every" claim was referred to a third party. Finally, Oxford said Buckley's Claim was referred to a third party due to "inconsistencies" that Oxford was unable to identify and pursuant to claim procedures it would not disclose.

    iv.  Oxford misrepresented that Curley was an independent and unbiased investigator.

b.    Oxford violated § 58-63-15(11)(b) and Chapter 75 by "[f]ailing to acknowledge and act reasonably promptly upon communications with respect to claims arising under insurance policies." Specifically, despite Buckley's requests for more than five months, Oxford failed to explain the alleged "inconsistencies" that caused Oxford to reverse its coverage decision and refer the Claim to a third-party investigator.

c.    Oxford violated § 58-63-15(11)(c) and Chapter 75 by "[f]ailing to adopt and implement reasonable standards for the prompt investigation of claims arising under insurance policies." Specifically:

    i.  Oxford delayed for months, until January 3, 2019, before referring the matter to a third-party investigator.

    ii.  After notifying Buckley that the matter was being referred to a third-party investigator on January 3, 2019, Oxford and the third-party investigator waited for three months and only began investigating the Claim after Buckley threatened litigation.

d.     Oxford violated § 58-63-15(11)(d) and Chapter 75 by "[r]efusing to pay claims without conducting a reasonable investigation based upon all available information." Specifically:

      i.   When Buckley first notified Oxford of its intent to file a claim, Oxford's General Counsel, without doing any investigation at all, said Oxford would refuse to pay the claim.

     ii.   Curley did not conduct a reasonable investigation because it questioned witnesses for the sole purpose of undermining the Claim, without attempting to develop any evidence that might support the Claim, and did not respond to and apparently ignored Buckley's detailed factual and legal presentation of the Claim, supported by expert analysis, which established that there was no basis in fact or in the applicable law to deny Buckley's Claim.

e.     Oxford violated § 58-63-15(11)(e) and Chapter 75 by "[f]ailing to affirm or deny coverage within a reasonable time after proof-of-loss statements have been completed." Specifically, Buckley submitted its proof-of-loss statement on November 2, 2018, establishing that it had suffered a loss in excess of $6 million and was thus entitled to insurance coverage of $6 million. Although Oxford initially stated that Buckley's Claim was covered, it quickly reversed its position. Eleven months later and counting, Oxford still has not notified Buckley that it has affirmed or denied coverage.

f.   Oxford violated § 58-63-15(11)(f) and Chapter 75 by "[n]ot attempting in good faith to effectuate a prompt, fair, and reasonable settlement of claims in which liability has become reasonably clear." Specifically, after approving coverage in writing on October 26, 2018, liability had become reasonably clear because Oxford had conceded it. In the past year, however, Oxford has not attempted in good faith to effectuate a prompt, fair, and reasonable settlement of Buckley's Claim. Oxford offered to pay a small fraction of the Claim in December 2018 without any explanation as to why Buckley was not entitled to the full $6 million of coverage, or why Buckley's net loss calculation was inaccurate. When Buckley declined Oxford's unreasonable offer, Oxford revoked its coverage decision and referred the matter to a third-party investigator to avoid its payment obligation and develop a basis to deny the Claim.

g.   Oxford violated § 58-63-15(11)(g) and Chapter 75 by "[c]ompelling [the] insured to institute litigation to recover amounts due under an insurance policy by offering substantially less than the amounts ultimately recovered in actions brought by such insured." Specifically, in December 2018, Oxford offered substantially less than the amounts that Buckley will recover in this lawsuit, which has compelled Buckley to institute this litigation.

h.   Oxford violated § 58-63-15(11)(h) and Chapter 75 by "[a]ttempting to settle a claim for less than the amount to which a reasonable man

40

would have believed he was entitled." Specifically, Buckley submitted a detailed calculation to Oxford showing that it lost more than $6 million. Oxford has failed to identify any inaccuracy in Buckley's calculation or any problem with Buckley's methodology in carrying out the calculation. Nor has Oxford offered any alternative methodology for calculating the net loss. Nevertheless, Oxford has attempted to settle the Claim for far less than $6 million without offering any explanation.

i.      Oxford violated § 58-63-15(11)(n) and Chapter 75 by "[f]ailing to promptly provide a reasonable explanation of the basis in the insurance policy in relation to the facts or applicable law for denial of the Claim or the offer of a compromise settlement." Specifically:

        i. Oxford has failed to promptly provide a reasonable explanation of the basis in the insurance policy in relation to the facts for denial of the Claim. Indeed, Oxford has failed even to notify Buckley that the Claim has been denied, let alone provide a reasonable explanation for that denial. Among other things, Oxford has not explained how the overwhelming, contemporaneous evidence of the voluntariness of Mr. Sandler's resignation—including documentary evidence and the testimony of three Buckley attorneys and two Latham attorneys—could be outweighed by Mr. Sandler's recent and uncorroborated statements that his resignation was involuntary.

41

ii. Oxford has failed to promptly provide a reasonable explanation of the basis in the insurance policy in relation to the applicable law for the denial of the Claim. Among other things, Oxford has not explained how it could deny coverage in light of North Carolina law that a resignation for the purpose of avoiding an investigation of misconduct is not involuntary.

iii. Buckley submitted a detailed calculation to Oxford on November 2, 2018, showing that Buckley lost more than $6 million. Oxford offered a compromise settlement that was a small fraction of Buckley's Claim without a reasonable explanation.

106. Furthermore, as alleged in the paragraphs above, Oxford violated the North Carolina Unfair Claims Settlement Practices Act, N.C. Gen. Stat. § 58-63-15(1) and Chapter 75 by "misrepresenting the terms of any policy issued or to be issued or the benefits or advantages promised thereby." Specifically, Oxford misrepresented in Endorsement 2 that Mr. Sandler was not a key employee for purposes of the Policy's Loss of Key Employee coverage.

107. Oxford's actions described above were unfair and/or deceptive, were in or affecting commerce, and caused injury to Buckley as set forth above. These actions constitute violations of the North Carolina Unfair and Deceptive Trade Practice Act, N.C. Gen. Stat. § 75-1.1 *et seq.*, and, pursuant to N.C. Gen. Stat. §§ 75-16 and 16.1, Buckley is entitled to compensatory damages, treble damages, and attorney's fees.

## FIFTH CAUSE OF ACTION
### Breach of Implied Covenant of Good Faith and Fair Dealing

108.    Buckley repeats and realleges each and every allegation set forth above, and incorporates them herein by reference.

109.    The Policy is a binding agreement between Buckley and Oxford.

110.    Every North Carolina contract, including the Policy, contains an implied covenant to deal with one another fairly and in good faith.

111.    At all times, Buckley fully performed all of its obligations under the Policy. Buckley incurred losses covered by the Policy in excess of the Policy's $6 million per-claim limit, and presented evidence to Oxford in support of its Claim.

112.    Oxford's misconduct as alleged above constitutes a breach of the implied covenant of good faith and fair dealing, in that Oxford, among other things: (1) stated that Buckley should not submit a claim at all and said that Oxford would deny coverage even before reviewing the Claim; (2) attempted to preclude such coverage by including Endorsement 2 in Buckley's final policy without Buckley's agreement; (3) agreed in writing to provide coverage for Buckley's Claim on October 26, 2018, but then reversed this decision without adequate explanation; (4) refused to adequately explain the alleged "inconsistences" that caused Oxford to refer the matter to a third-party investigator; (5) asserted without any supporting evidence or calculation that Buckley's loss from Mr. Sandler's departure was only between $500,000 and $1,000,000, a fraction of the Firm's actual net loss of more than $6 million; (6) proposed an unreasonably low payment for Buckley's Claim without any reasoned basis or explanation as to how such a payment reflected Buckley's actual net loss from Mr. Sandler's departure; (7) purported to rely on claim procedures to refer the matter to

43

a third party for investigation but refused to disclose the claim procedures to Buckley;
(8) misrepresented to Buckley that Curley would conduct an independent and unbiased
investigation; and (9) failed or refused to communicate to Buckley a reasoned basis for
affirming or denying the Claim.

113.    Based on these actions, Oxford violated the implied covenant to deal with
Buckley fairly and in good faith, and injured Buckley's right to receive the benefits of the
Policy.  Oxford's conduct has been of an aggravated nature and amounts to tortious conduct
independent of any breach of contract by Oxford.

114.    As a direct and proximate result of Oxford's actions, Buckley has sustained
damages in excess of $1,000,000, for which it is entitled to recover compensatory damages
and punitive damages in such amount as the evidence may establish at trial.

## SIXTH CAUSE OF ACTION
### Tortious Refusal to Settle Insurance Claim

115.    Buckley repeats and realleges each and every allegation set forth above, and
incorporates them herein by reference.

116.    Oxford's misconduct as alleged above constitutes a bad faith refusal to settle a
legitimate insurance claim and aggravating or outrageous conduct, in that Oxford: (1) stated
that Buckley should not submit a claim at all and said that Oxford would deny coverage even
before reviewing the Claim; (2) attempted to illegally preclude such coverage by including
Endorsement 2 in Buckley's final policy without Buckley's agreement; (3) agreed in writing
to provide coverage for Buckley's Claim but then reversed this decision and provided false
and/or confusing information to question whether Buckley was entitled to coverage;
(4) refused to adequately explain the alleged "inconsistences" that caused Oxford to refer the

44

matter to a third-party investigator; (5) asserted without any supporting evidence or calculation that Buckley's loss from Mr. Sandler's departure was only between $500,000 and $1,000,000, a fraction of the Firm's actual net loss of over $6 million; (6) proposed an unreasonably low payment for Buckley's Claim without any reasoned basis or explanation as to how such a payment reflected Buckley's actual net loss from Mr. Sandler's departure; (7) purported to rely on claim procedures to refer the matter to a third party for investigation but refused to disclose the claim procedures to Buckley; (8) misrepresented to Buckley that Curley would conduct an independent and unbiased investigation; and (9) failed or refused to communicate to Buckley a reasoned basis for affirming or denying the Claim.

117.    Oxford provided Buckley with no documentation or analysis of its investigation to indicate that its proposed payment of a small fraction of Buckley's $6 million Claim reflected an honest difference of opinion regarding the value of Buckley's Claim or was based on innocent or honest mistake.

118.    As a direct and proximate result of Oxford's actions, Buckley has sustained damages in excess of $1,000,000, for which it is entitled to recover compensatory damages and punitive damages in such amount as the evidence may establish at trial.

WHEREFORE, Plaintiff seeks relief as follows:

1.  compensatory damages in excess of $1,000,000 in an amount according to the proof at trial;

2.  punitive damages as permitted by law for Oxford's breach of the implied covenant of good faith and fair dealing and tortious refusal to settle an insurance claim;

3. treble damages as permitted by N.C. Gen. Stat. § 75-16 for Oxford's unfair or decleptive trade practices;

4. the cost of this action, including reasonable attorney's fees and costs to be taxed against the defendant, as permitted by Section VII.B of the Policy and N.C. Gen. Stat. § 75-16.1;

5. a declaratory judgment declaring the parties' rights and obligations as set forth herein;

6. trial by jury on all issues of fact; and

7. any other and further relief as determined proper by the Court.

Dated: October 29, 2019

Joshua D. Davey
N.C. State Bar. No. 35246
Andrew D. Atkins
N.C. State Bar No. 44188
McGuireWoods LLP
201 N. Tryon Street, Suite 3000
Charlotte, North Carolina 28202
Telephone: (704) 343-2000
Facsimile: (704) 343-2000
Email: jdavey@mcguirewoods.com
Email: aatkins@mcguirewoods.com

Mary Ellen Goode
N.C. State Bar. No. 50733
McGuireWoods LLP
434 Fayetteville Street, Suite 2600
Raleigh, North Carolina 27601
Telephone: (919) 755-6600
Facsimile: (919) 755-6900
Email: mgoode@mcguirewoods.com

*Attorneys for Plaintiff Buckley LLP*

46

OF COUNSEL:

John K. Villa
William T. Burke
Elizabeth A. Wilson
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, D.C. 20005
Telephone: (202) 434-5000
Facsimile: (202) 434-5029
Email: jvilla@wc.com
Email: wburke@wc.com
Email: ewilson@wc.com

*Pro Hac Vice Admissions Pending*